1  JEFFREY KALIEL (CA 238293)
   **TYCKO & ZAVAREEI LLP**
2  1828 L Street, N.W., Suite 1000
   Washington, DC  20036
3  Telephone: (202) 973-0900
   Facsimile: (202) 973-0950
4  *jkaliel@tzlegal.com*

5
   JEFFREY M. OSTROW (pro hac vice to be filed)
6  **KOPELOWITZ OSTROW P.A.**
   200 S.W. 1st Avenue, 12th Floor
7  Fort Lauderdale, FL 33301
   Telephone: (954) 525-4100
8  Facsimile: (954) 525-4300
   ostrow@kolawyers.com
9

10 *Counsel for Plaintiffs and Proposed Classes*

11            UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF CALIFORNIA
12

13 JENNA LLOYD and JAMIE
   PLEMONS, on behalf of themselves
14 and all others similarly situated,        **CLASS ACTION COMPLAINT**

15              Plaintiffs,                   CASE NO. __'17CV1280 BAS RBB__

16       vs.

17 NAVY FEDERAL CREDIT UNION,

18              Defendant.

19

20

21

22

23

24

25

26

27

28

## CLASS ACTION COMPLAINT

Plaintiffs, Jenna Lloyd and Jamie Plemons, individually and on behalf of all persons similarly situated, for complaint against Defendant Navy Federal Credit Union, allege as follows:

## INTRODUCTION

1.  This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant, Navy Federal Credit Union ("NFCU") and Doe Defendants 1-50, arising from the unfair and unconscionable assessment and collection of "Optional Overdraft Protection Fees" ("OOPFs").

2.  At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, NFCU immediately decrements consumers' checking accounts for the amount of the purchase and sets aside funds in a checking account to cover that specific transaction.  As a result, and with limited exceptions, customers' accounts *always* have sufficient available funds to cover these transactions throughout their entire life-cycle.

3.  However, NFCU still assesses crippling $20 OOPFs on many of these transactions, in violation of its contractual promises not to do so.

4.  Despite putting aside sufficient available funds for debit card transactions, NFCU charges OOPFs on those same transactions if they purportedly settle—days later—into a negative balance ("Authorize Positive, Purportedly Settle Negative Transactions" or "APPSN Transactions").

5.  Here is how it works.  NFCU maintains a running account balance in real time, tracking funds consumers have for immediate use.  This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instant they are made.  When a customer makes a purchase with a debit card, NFCU sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's account balance.  Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card

transaction.

6.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

7.    That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has been reduced to account for earlier debit card transactions.  This means that many subsequent transactions incur OOPFs due to the unavailability of the funds sequestered for those debit card transactions.

8.    Still, despite keeping those held funds off-limits for other transactions, NFCU improperly charges OOPFs on APPSN Transactions—the latter which always have sufficient available funds to be "covered."

9.    Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "deceptive" when:

> a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged.

Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair."

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights.

10.     There is no justification for these practices, other than to maximize NFCU's OOPF revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But NFCU is free to protect its interests and either reject those intervening transactions or charge OOPFs on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But NFCU was not content with these millions in OOPFs. Instead, it sought millions *more* in OOPFs on APPSN Transactions.

11.     Besides being deceptive, unfair and unconscionable, these practices breach contract promises made in the NFCU's adhesion contracts—contracts which

fundamentally misconstrue the true nature of the NFCU's processes and practices. These practices also exploit contractual discretion to gouge consumers.

12. In plain, clear, and simple language, the checking account contract documents covering OOPFs promise that the NFCU will <u>only</u> charge OOPFs on transactions with insufficient funds to "cover" a given transaction:

> An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.

Ex. A, NFCU "What You Need to Know About Overdrafts and Overdraft Fees."

13. But for APPSN transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to "cover" those transactions—yet NFCU assesses OOPFs on them anyway.

14. Moreover, NFCU reaffirms that debit cards transactions are "authorized and approved" immediately, in one fell swoop:

> We may **authorize and approve** the following types of transactions under our Optional Overdraft Protection Service (OOPS) if you ask us (see below):
>
> • Checks and other transactions made using your checking account number   • ATM transactions   • Debit card transactions   • Electronic debits cleared through the Automated Clearing House (ACH)

*Id*.

15. This promise indicates that transactions are only "OOPS" transactions when they are "authorized and approved" into a negative balance. Of course, that is not true for APPSN transactions.

16. Lest there be any doubt, NFCU also clarifies that "authorization" and "payment" are a linked and essentially coterminous process—in other words, that authorization necessitates payment, and account balances are deducted once for any given transaction:

CLASS ACTION COMPLAINT

> We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined and/or your check/ACH will be returned.

*Id.*

17.    In fact, NFCU actually "authorizes" transactions on positive funds, sets those funds aside on a hold, then fails to use those same funds to "pay" those same transactions when they settle.

18.    All these representations and contractual promises are untrue.  In fact, NFCU charges OOPFs even when sufficient funds exist to "cover" transactions that are "authorized and approved" into a positive balance.

19.    Bizarrely, this means NFCU actually debits an account twice for the same transaction—not just at the moment of purchase, but later during a secret posting process described below.

20.    The NFCU breaches these plain contractual promises when it assesses OOPFs on APPSN Transactions that ***did*** have funds to cover them throughout their lifecycle.  By definition, there are always available funds sufficient to "cover" debit card transactions authorized into positive funds, for the simple reason that those funds are sequestered at the instant of authorization (as described above).

21.    The contract also fundamentally misconstrues the process by which OOPFs are determined—and, more generally, how debit card transactions are executed.

22.    In short, NFCU is not authorized by contract to charge OOPFs on APPSN Transactions, but it has done so and continues to do so, to the tune of millions of dollars in consumer harm every year.

23.    Plaintiffs and other NFCU customers have been injured by NFCU's practices.  On behalf of themselves and the putative class, Plaintiffs seek damages, restitution and injunctive relief for NFCU's breach of contract, unjust enrichment, conversion, and violation of California consumer protection law.

**JURISDICTION AND VENUE**

24.    This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than NFCU.

25.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because NFCU is subject to personal jurisdiction here and regularly conducts business in the Central District of California, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

**PARTIES**

26.    Plaintiffs are citizens of the State of California.  At all times relevant, Plaintiffs patronized NFCU banking centers located in Orange County, CA. Riverside County, CA, and San Diego County, CA.

27.    Defendant NFCU is a national bank with its headquarters and principal place of business located in Vienna, Virginia.  Among other things, NFCU is engaged in the business of providing retail banking services to consumers, including Plaintiffs and members of the putative classes, which includes the issuance of debit cards for use by its customers in conjunction with their checking accounts.  NFCU operates banking centers, and thus conducts business, throughout the State of California and the United States.

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

28.    Plaintiffs have checking accounts with NFCU.

29.    NFCU issues debit cards to its checking account customers, including Plaintiffs, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.

CLASS ACTION COMPLAINT

30.    Pursuant to its standard account agreement, NFCU charges fees (currently in the amount of $20) for debit card transactions that purportedly result in an overdraft.

**A. Mechanics of a Debit Card Transaction**

31.    A debit card transaction occurs in two parts.  First, authorization for the purchase amount is instantaneously obtained by the merchant from the NFCU.  When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to NFCU, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

32.    At this step, if the transaction is approved, NFCU immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

33.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

34.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.  This is referred to in the banking industry as "posting" or "settling"—something which may occur several days after the transaction was initially initiated.

35.     There is no change—no impact whatsoever—to the available funds in an account when posting or payment of a transaction that settles in the same amount for which it authorized occurs.  That is because available funds amounts do not change for debit card transactions that settle in the same amount for which they were authorized.

**B. NFCU Account Documents**

36.     Plaintiffs' checking accounts with NFCU were, at all relevant times, governed by NFCU's standardized contract for deposit accounts, the material terms of which are drafted by NFCU, amended by NFCU from time to time at its convenience and complete discretion, and imposed by NFCU on all of its customers.

37.     NFCU's "What You Need to Know About Overdrafts and Overdraft Fees," the portion of the standardized contract dealing with overdraft fees, contains the following relevant provisions.

38.     The checking account contract documents covering OOPFs promise that the NFCU will only charge OOPFs on transactions with insufficient funds to "cover" a given transaction:

> An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.

Ex. A.

39.     The critical contract term "to cover" is never defined.

40.     For APPSN transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to "cover" those transactions—yet NFCU assesses OOPFs on them anyway.

41.     Moreover, NFCU reaffirms that debit card transactions are "authorized and approved" immediately, in one fell swoop:

> We may **authorize and approve** the following types of transactions under our Optional Overdraft Protection Service (OOPS) if you ask us (see below):

• Checks and other transactions made using your checking account number  • ATM transactions  • Debit card transactions  • Electronic debits cleared through the Automated Clearing House (ACH)

*Id.*

42.    This promise indicates that transactions are only "OOPS" transactions when they are "authorized and approved" into a negative balance.  Of course, that is not true for APPSN transactions.

43.    Lest there be any doubt, NFCU also clarifies that "authorization" and "payment" are a linked and essentially coterminous process—in other words, that authorization necessitates payment, and account balances are deducted once for any given transaction:

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined and/or your check/ACH will be returned.

*Id.*

44.    In fact, NFCU actually "authorizes" transactions on positive funds, sets those funds aside on a hold, then fails to use those same funds to "pay" those same transactions when they settle.  Instead, it uses a secret posting process described below.

45.    All these representations and contractual promises are untrue.  In fact, NFCU charges OOPFs even when sufficient funds exist to "cover" transactions that are "authorized and approved" into a positive balance.

46.    No express language in any document states that the NFCU may impose fees for overdrafts on APPSN Transactions.

**C. The Account Documents Fundamentally Misconstrue the NFCU's True Overdraft Fee and Debit Processing Practices**

47.    The Account Documents misconstrue the NFCU's true debit card processing and OOPF practices in at least four ways.

48.    First, and most fundamentally, the NFCU charges OOPFs on debit card transactions for which there are sufficient available funds to "cover" the transactions.

That is despite contractual representations that the NFCU will only charge OOPFs on transactions with insufficient available funds to "cover" a given transaction.

49.    The NFCU assesses OOPFs on APPSN Transactions that **_do_** have sufficient available funds to "cover" them throughout their lifecycle.

50.    Those available funds are sequestered at the moment a debit card transaction is approved by NFCU.

51.    The NFCU's practice of charging OOPFs even where sufficient available funds exist to "cover" a transaction violates a contractual promise not to do so.  This discrepancy between the NFCU's actual practice and the contract causes consumers like Plaintiffs to incur more OOPFs than they should.

52.    Third, sufficient funds for APPSN Transactions actually are debited from the account immediately, consistent with standard industry practice.

53.    Because these withdrawals take place upon initiation, then cannot be re-debited later.  But that is what NFCU does when it re-debits the account during a secret batch posting process.

54.    In reality, the NFCU's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and at the time of settlement.  Then the NFCU makes that determination again, at settlement.

55.    At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds.  As such, NFCU cannot then charge an OOPF on such a transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

56.    Upon information and belief, something more is going on:  at the moment a debit card transaction is getting ready to settle, NFCU does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, NFCU releases the hold it had placed on funds for the transaction for a

split second, putting money back into the account, then re-debits the same transaction a second time.

57.    This secret step allows it to charge overdraft fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which NFCU specifically set aside money to pay them.

58.    This discrepancy between the NFCU's actual practices and the contract causes consumers to incur more OOPFs than they should.

59.    In sum, there is a yawning gap between the NFCU's practices as described in the account documents and the NFCU's practices in reality.

**D. The NFCU Abuses Contractual Discretion**

60.    The NFCU's treatment of debit card transactions to charge OOPFs is not simply a breach of the express terms of the numerous account documents.  In addition, NFCU exploits contractual discretion to the detriment of accountholders when it uses these policies.

61.    The term "to cover" a transaction is undefined. The NFCU uses its discretion to define "to cover" in a manner contrary to any reasonable, common sense understanding of that term.  In NFCU's definition, a transaction is not "covered" even if the NFCU sequesters sufficient available funds for that transaction.

62.    Moreover, NFCU uses its contractual discretion to cause APPSN Transactions to incur OOPFs by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions: "We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined and/or your check/ACH will be returned." Ex. A.

63.    NFCU uses all of these contractual discretion points unfairly to extract OOPFs on transactions that no reasonable consumer would believe could cause OOPFs.

### E. Reasonable Consumers Understand Debit Card Transactions are Debited Immediately

64.     The assessment of OOPFs on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions.  That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions).  If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

65.     NFCU was and is aware that this is precisely how its accountholders reasonably understand debit card transactions to work.

66.     NFCU well knows that many consumers prefer debit cards for these very reasons.  Consumer research indicates that consumers prefer debit cards as a budgeting device; because they don't allow debt like credit cards do; and because the money comes directly out of a checking account.

67.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." See http://www.consumeraction.org/helpdesk/articles/what _do_i_need_to_know_about_using_a_debit_card (last visited June 8, 2016) (emphasis added).

68.     Further, Consumer Action informs consumers that, "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full."

69.     This is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by

approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[1]

70.    Not only have consumers increasingly substituted from cash to debit cards, but they believe that a debit cards purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

71.    NFCU was aware of a consumer perception that debit transactions reduce an available balance *in a specified order*—namely, the order the transactions are actually initiated—and its account agreement only supports this perception.

**F. Plaintiffs' Experience**

72.    On October 27, 2014, Plaintiff Lloyd was assessed three (3) OOPFs in the amount of $20.00 each for six transactions that settled that day, five (5) of which were debit card transactions that were initiated on or prior to October 26, 2014—all despite the fact that positive funds were deducted immediately for at least there (3) of the debit card transactions on which she was assessed OOPFs.

73.    Indeed, the only reason any of the five debit card transactions that settled on October 27 incurred overdraft fees was because of a $260 ATM withdrawal that Plaintiff Lloyd made *after* the debit card transactions had already been initiated.

74.    Plaintiff does not dispute that NFCU was within its rights to charge an OOPF on the ATM transaction, because it was authorized into insufficient funds. Plaintiff Lloyd disputes that NFCU was authorized to charge OOPFs on the prior in time debit card transactions.

75.    On January 31, 2014, 2014, Plaintiff Lloyd was assessed three (3) OOPFs in the amount of $20.00 each for four (4) transactions, three (3) of which were debit

---

[1]  Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MARKETWATCH, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23

card transactions. Upon information and belief, positive funds were deducted immediately for at least two (2) of the debit card transactions on which she was assessed OOPFs.

76. Indeed, the only reason any of the three debit card transactions that settled on January 31 incurred overdraft fees was because of a $400 ATM withdrawal that Plaintiff Lloyd made *after* some or all of the debit card transactions had already been initiated.

77. Plaintiff Lloyd does not dispute that NFCU was within its rights to charge an OOPF on the ATM transaction, because it was authorized into insufficient funds. Plaintiff Lloyd disputes that NFCU was authorized to charge OOPFs on the prior in time debit card transactions that were authorized into sufficient funds.

78. NFCU assessed OOPFs on the held transactions even though it had sequestered available funds for those transactions at the time they were authorized.

79. On February 18, 2014, Plaintiff Plemons was assessed three (3) OOPFs in the amount of $20.00 each for three transactions that settled that day, two (2) of which were debit card transactions that were initiated on or prior to February 15, 2014—all despite the fact that positive funds were deducted immediately for at least two (2) of the debit card transactions on which he was assessed OOPFs.

80. Indeed, the only reason any of the two debit card transactions that settled on February 18, 2014 incurred overdraft fees was because of a $82.75 ATM withdrawal that Plaintiff Plemons made *after* the debit card transactions had already been initiated.

81. Plaintiff does not dispute that NFCU was within its rights to charge an OOPF on the ATM transaction, because it was authorized into insufficient funds. Plaintiff Plemons disputes that NFCU was authorized to charge OOPFs on the prior in time debit card transactions.

82. NFCU assessed OOPFs on the held transactions even though it had sequestered available funds for those transactions at the time they were authorized.

# CLASS ALLEGATIONS

83.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.   This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

84.    The proposed classes are defined as:

All NFCU checking account holders in the United States who, from June 22, 2011, through the date of class certification, were charged OOPFs on transactions that were authorized into a positive available balance (the "National Class").

All NFCU checking account holders in California who, from June 22, 2011, through the date of class certification, were charged OOPFs on transactions that were authorized into a positive available balance (the "California Sub-Class").

The National Class and the New York Subclass are collectively referred to as the "Classes."

85.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

86.    Excluded from the Classes are NFCU, its parents, subsidiaries, affiliates, officers and directors, any entity in which NFCU has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

87.    The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to NFCU's records.

88.    The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all Class members, were charged OOPFs by NFCU as a result of charging OOPFs on transactions that were authorized into a sufficient available balance, but whose available balances were insufficient at

the time the transactions were settled. The representative Plaintiffs, like all Class members, have been damaged by NFCU's misconduct in that they have been assessed unfair and unconscionable overdraft charges. Furthermore, the factual basis of NFCU's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

89.    There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

90.    Among the questions of law and fact common to the Classes are whether NFCU:

    a.  Imposed OOPFs on debit card transactions when those transactions were authorized into sufficient available balances or funds available;

    b.  Breached its contract and the covenant of good faith and fair dealing with Plaintiffs and other members of the Classes through its overdraft policies and practices on APPSN Transactions;

    c.  Converted money belonging to Plaintiffs and other members of the Classes through its overdraft policies and practices;

    d.  Was unjustly enriched through its overdraft policies and practices; and

    e.  Violated the consumer protection acts of certain states through its overdraft policies and practices.

Other questions of law and fact common to the Classes include:

    f.  The proper method or methods by which to measure damages, and

    g.  The declaratory relief to which the Classes are entitled.

91.    Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices of NFCU's Rules Governing Deposit Accounts. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

92.    Plaintiffs are committed to the vigorous prosecution of this action and

have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

93.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of NFCU, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and NFCU's misconduct will proceed without remedy.

94.    Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract**
**(On Behalf of the Classes)**

95.    Plaintiffs repeats paragraphs 1 through 94 above.

96.    Plaintiffs and NFCU have contracted for bank account deposit, checking, ATM, and debit card services.

97.    NFCU misconstrued in the account documents its true debit card processing and OOPF practices and breached the express terms of the account documents.

98.    NFCU breached promises included in the account documents.

99.    No contract provision authorizes NFCU to charge OOPFs on APPSN Transactions.

100.    Therefore, NFCU breached the terms of its account documents by charging OOPFs on transactions that were authorized into a sufficient available balance, but whose available balances were allegedly insufficient at the time the transactions were settled.

101.    Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

102.    Plaintiffs and members of the Classes have sustained damages as a result of NFCU's breach of the contract.

**SECOND CLAIM FOR RELIEF**
**Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of the Classes)**

103.    Plaintiffs repeats paragraphs 1 through 94 above.

104.    Plaintiffs and NFCU have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in contract documents.

105.    Under the laws of the states where NFCU does business, good faith is an element of every contract pertaining to the assessment of OOPFs.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.   Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.   Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

106.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of

1   bad faith are evasion of the spirit of the bargain, willful rendering of imperfect

2   performance, abuse of a power to specify terms, and interference with or failure to

3   cooperate in the other party's performance.

4      107.  NFCU has breached the covenant of good faith and fair dealing in the

5   contract through its overdraft policies and practices as alleged herein.  Specifically,

6   NFCU harms consumers by abusing its contractual discretion in a number of ways

7   which no reasonable consumer would anticipate.  <u>First</u>, the term "to cover" a

8   transaction is undefined, and the NFCU uses its discretion to define "to cover" in a

9   manner contrary to any reasonable, common sense understanding of that term.  In the

10  NFCU's definition, a transaction is not "covered" even if the NFCU sequesters

11  sufficient available funds for that transaction at the time it is initiated.

12     108.  <u>Second</u>, NFCU uses its contractual discretion to cause APPSN

13  Transactions to incur OOPFs by knowingly authorizing later transactions that it allows

14  to consume available funds previously sequestered for APPSN Transactions: "We pay

15  overdrafts at our discretion, which means we do not guarantee that we will always

16  authorize and pay any type of transaction. If we do not authorize and pay an overdraft,

17  your transaction will be declined and/or your check/ACH will be returned."

18     109.  NFCU uses these contractual discretion points to extract OOPFs on

19  transactions that no reasonable consumer would believe could cause OOPFs.

20     110.  Plaintiffs and members of the Classes have performed all, or substantially

21  all, of the obligations imposed on them under the account documents.

22     111.  Plaintiffs and members of the Classes have sustained damages as a result

23  of NFCU's breach of the covenant of good faith and fair dealing.

24  **THIRD CLAIM FOR RELIEF**
**Conversion**
**(On Behalf of the Classes)**

25

26

27     112.  Plaintiffs repeats paragraphs 1 through 94 above.

28     113.  NFCU had and continues to have a duty to maintain and preserve its

customers' checking accounts and to prevent their diminishment through its own

1  wrongful acts.

2      114.   NFCU has wrongfully collected OOPFs from Plaintiffs and the members

3  of the Classes, and has taken specific and readily identifiable funds from their accounts

4  in payment of these fees in order to satisfy them.

5      115.   NFCU has, without proper authorization, assumed and exercised the right

6  of ownership over these funds, in hostility to the rights of Plaintiffs and the members

7  of the Classes, without legal justification.

8      116.   NFCU continues to retain these funds unlawfully without the consent of

9  Plaintiffs or members of the Classes.

10      117.   NFCU intends to permanently deprive Plaintiffs and the members of the

11  Classes of these funds.

12      118.   These funds are properly owned by Plaintiffs and the members of the

13  Classes, not NFCU, which now claims that it is entitled to their ownership, contrary to

14  the rights of Plaintiffs and the members of the Classes.

15      119.   Plaintiffs and the members of the Classes are entitled to the immediate

16  possession of these funds.

17      120.   NFCU has wrongfully converted these specific and readily identifiable

18  funds.

19      121.   NFCU's wrongful conduct is continuing.

20      122.   As a direct and proximate result of this wrongful conversion, Plaintiffs

21  and the members of the Classes have suffered and continue to suffer damages.

22      123.   By reason of the foregoing, Plaintiffs and the members of the Classes are

23  entitled to recover from NFCU all damages and costs permitted by law, including all

24  amounts that NFCU has wrongfully converted.

25                  **FOURTH CLAIM FOR RELIEF**

26                        **Unjust Enrichment**
                        **(On Behalf of the Classes)**
27

28      124.   Plaintiffs repeats paragraphs 1 through 94 above, excluding statements

which allege that valid contractual terms govern the challenged conduct.

125.   Plaintiffs, on behalf of themselves and the Classes, assert a common law claim for unjust enrichment, in the alternative.

126.   By means of NFCU's wrongful conduct alleged herein, NFCU knowingly provided banking services to Plaintiffs and members of the Classes that was unfair, unconscionable, and oppressive.

127.   NFCU knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Classes.  In so doing, NFCU acted with conscious disregard for the rights of Plaintiffs and members of the Classes.

128.   As a result of NFCU's wrongful conduct as alleged herein, NFCU has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Classes.

129.   NFCU's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

130.   Under the common law doctrine of unjust enrichment, it is inequitable for NFCU to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of OOPFs on Plaintiffs and members of the Classes in an unfair, unconscionable, and oppressive manner.  NFCU's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

131.   The financial benefits derived by NFCU rightfully belong to Plaintiffs and members of the Classes.  NFCU should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Classes all wrongful or inequitable proceeds received by them.  A constructive trust should be imposed upon all wrongful or inequitable sums received by NFCU traceable to Plaintiffs and the members of the Classes.

132.   Plaintiffs and members of the Classes have no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
### Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200
### Fraudulent Prong
### (On Behalf of the California Subclass)

133.   Plaintiffs repeat paragraphs 1 through 94 above.

134.   NFCU's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, *et seq.*

135.   NFCU's conduct violates the UCL's "fraudulent" prong in the following respect, among others:

> NFCU's practice of falsely indicating in account documents that OOPFs will not be charged when sufficient funds exist to "cover" transactions.

136.   As a result of NFCU's violations of the UCL's "fraudulent" prong, Plaintiffs and members of the California Subclass have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby have suffered and will continue to suffer actual damages.

137.   Pursuant to California Business and Professions code section 17203, Plaintiffs and the California Subclass are therefore entitled to, *inter alia*:

    a.  An order requiring NFCU to cease the fraudulent acts alleged herein;

    b.  Full restitution of all OOPFs paid to NFCU on APPSN transactions, pursuant to California Code of Civil Procedure section 384;

    c.  Pre-judgment interest at the highest rate allowable by law; and

    d.  Payment of their attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5.

## SIXTH CLAIM FOR RELIEF
### Violation of The Consumer Legal Remedies Act,
### California Civil Code §§ 1750, *et seq.*
### (On behalf of the California Subclass)

138.   This cause of action is brought pursuant to the CLRA.

139.   Plaintiffs and each member of the Class is a "consumer" within the meaning of California Civil Code § 1761(d).

140.   NFCU's checking accounts and debit card services were transactions within the meaning of California Civil Code § 1761(e).

141.   NFCU violated the CLRA when it violated the UCL, as discussed above.

142.   Plaintiffs request this Court enjoin NFCU from continuing to violate the CLRA as alleged herein in the future. Otherwise, Plaintiffs, the Class and members of the general public may be irreparably harmed and/or denied effective and complete remedy if such an order is not granted.

143.   Plaintiffs may seek amendment in the future to seek restitution to Plaintiffs and each member of the proposed class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.   Declaring NFCU's OOPF policies and practices to be wrongful, unfair and unconscionable;

2.   Restitution of all OOPFs paid to NFCU by Plaintiffs and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.   Disgorgement of the ill-gotten gains derived by NFCU from its misconduct;

4.   Actual damages in an amount according to proof;

5.   Punitive and exemplary damages;

6.   Pre-judgment interest at the maximum rate permitted by applicable law;

7.   Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.   Such other relief as this Court deems just and proper.

CLASS ACTION COMPLAINT

# **DEMAND FOR JURY TRIAL**

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated: June 22, 2017                    Respectfully submitted,

   /s/ Jeffrey Kaliel
JEFFREY KALIEL (CA 238293)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, DC  20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
*jkaliel@tzlegal.com*

JEFFREY M. OSTROW (*pro hac vice* to be filed)
**KOPELOWITZ OSTROW P.A.**
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com

***Counsel for Plaintiffs and Proposed Classes***