1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**
9           **SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| JENNA LLOYD, *et al.*, | Case No. 17-cv-1280-BAS-RBB |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| NAVY FEDERAL CREDIT UNION, | **[ECF No. 9]** |
| Defendant. | |

Presently before the Court is Navy Federal's motion to dismiss the First Amended Complaint ("FAC") in its entirety. (ECF No. 9.) Plaintiffs have opposed the motion (ECF No. 11) and Navy Federal has replied in support of dismissal (ECF No. 12). For the reasons herein, the Court grants in part and denies in part Navy Federal's motion to dismiss.

I.     **BACKGROUND**

A.     **Factual Background**

Navy Federal is a national bank with its headquarters and principal place of business located in Vienna, Virginia. (FAC ¶27.) Navy Federal's banking services include the issuance of debit cards associated with its customers' checking accounts. (*Id.*) The debit cards allow Navy Federal's customers to have electronic access to their checking accounts for purchases, payments, withdrawals, and other electronic

debit transactions. (*Id.* ¶29.) Plaintiffs Lloyd and Plemons are citizens of California who have accounts and debit cards with Navy Federal and patronized its banking centers located in southern California. (*Id.* ¶¶26, 28.) They seek to represent a national class of Navy Federal customers charged overdraft fees on transactions authorized into a positive account balance and a sub-class of Navy Federal customers in California. (*Id.* ¶84.)

### 1. Navy Federal's Debit Card Transaction Procedure

Integral to Plaintiffs' FAC is Navy Federal's debit card transaction procedure. Plaintiffs allege Navy Federal maintains a running account balance in real time, which tracks funds consumers have for immediate use, which is adjusted in real time to account for debit card transactions when they are made. (*Id.* ¶5.) This procedure occurs in two steps. First, a merchant instantaneously obtains authorization for the purchase amount of a debit card transaction from Navy Federal, which verifies that a customer's account is valid and has sufficient funds to cover a transaction amount. (*Id.* ¶31.) Second, for an approved transaction, Navy Federal immediately decrements the amount of the funds in a customer's account and sequesters the funds, but does not yet transfer the funds to a merchant. (*Id.* ¶¶2, 5, 32, 50, 52.) At a later point, which can be several days after the transaction, the sequestered funds are transferred from the customer's account to the merchant's account, a process known as settling. (*Id.* ¶34.) Plaintiffs allege that the purpose of sequestering the funds is to ensure there are sufficient funds in the account to pay for the transaction when it settles. (*Id.* ¶33.) The sequestered funds are not available for any other use by the customer. (*Id.* ¶2.)

### 2. Navy Federal's Account Agreements and Alleged Unlawful Imposition of Overdraft Fees

Navy Federal allegedly charges and collects overdraft fees on debit card transactions for which there were sufficient available funds to cover the transactions

in violation of the Account Agreements[1], resulting in millions more dollars of profit to Navy Federal. (*Id.* ¶¶3, 10, 18, 20, 22, 48–49, 51.)

The key agreement on which the FAC focuses is the Opt-In Form, titled "What You Need to Know About Overdrafts and Overdraft Fees." (FAC ¶36; Ex. A ("Opt-in Form").) This document is Navy Federal's standardized contract dealing with overdraft fees and Navy Federal's "Optional Overdraft Protection Service" ("OOPS"). (*Id.* ¶37.) An individual may opt into OOPS by completing the form. (*See* Opt-in Form.) The form identifies the terms and conditions of OOPS, including that Navy Federal charges a $20 fee each time Navy Federal pays an overdraft. (FAC ¶¶3, 30; Opt-in Form at 1.)

Plaintiffs identify certain provisions of the Opt-in Form at issue here. First, the Opt-in Form provides that: "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." (FAC ¶12; Opt-in Form at 1.) Plaintiffs allege that this provision means that Navy Federal promises it will only charge an overdraft fee on a given transaction for which there are insufficient funds to cover. (FAC ¶¶12, 38.) Plaintiffs allege that when a debit card transaction is approved on a positive account balance and funds are sequestered, there are always sufficient funds available to cover the transaction when it settles. (*Id.* ¶¶2, 8, 13, 20, 39–40.) Navy Federal allegedly violates this contractual promise

_____

[1] Plaintiffs have attached to the FAC Navy Federal's Opt-in Form for overdraft protection and Navy Federal's "Important Disclosures," a document setting forth the terms governing Plaintiffs' accounts with Navy Federal. (FAC Ex. A ("Opt-In Form"); Ex. B ("Important Disclosures").) Because these documents are attached to the FAC, the Court may properly consider these documents. *See Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012). Navy Federal also directs the Court to its Debit Card Disclosure as an agreement which sets forth the terms applicable to its customers' debit card transactions. (ECF No. 9-2 Ex. B ("Debit Card Disclosure").) The Court finds that the Debit Card Disclosure is incorporated by reference into the FAC. *Davis*, 691 F.3d at 1160. Plaintiffs have not objected to this determination. The Court herein refers to the Opt-In Form, Important Disclosures, and Debit Card Disclosure as the "Account Agreements".

by authorizing transactions on positive funds and setting the funds aside to pay those transactions when they settle, but then failing to use those funds when the transactions settle. (*Id.* ¶¶17, 18, 44.) Acknowledging that the term "to cover" is not defined, Plaintiffs further allege that Navy Federal abuses its contractual discretion to define the term so that a transaction is not covered when it settles even if sufficient funds existed for the transaction when it was authorized. (*Id.* ¶61.)

Second, Plaintiffs allege that the Opt-in Form links authorization of a transaction with payment. The Form states that Navy Federal "may authorize and approve" certain transactions under OOPS. (*Id.* ¶41.) Plaintiffs allege that this statement reflects a contractual promise that transactions are only OOPS transactions when they are authorized and approved into a negative balance. (*Id.* ¶¶15, 42.) Navy Federal allegedly links authorization and payment of a transaction in the Opt-in Form's statement that: "We pay overdrafts at our discretion, which means that we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined and/or your check/ACH will be returned." (*Id.* ¶¶16, 43; Opt-in Form.) Plaintiffs allege that despite sequestering funds for payments of debit card transactions authorized into positive balance, Navy Federal re-debits the amount to an account during a "secret batch posting process." (FAC ¶¶19, 53, 56.) By doing so, Plaintiffs allege that Navy Federal assays the same debit card transaction twice to determine if the transaction overdraws an account—both at the time the transaction is authorized and at the time it settles. (*Id.* ¶54.) Plaintiffs allege that the available balance does not change for transactions previously authorized into positive funds. (*Id.* ¶55.) However, Navy Federal allegedly abuses its contractual discretion by knowingly authorizing transactions that consume funds previously sequestered for debit card transactions. (*Id.* ¶¶10, 62.) Consequently, Navy Federal assesses overdraft fees on the debit card transaction when it settles. (*Id.* ¶57.)

Plaintiffs further allege that Navy Federal's representations and promises in

– 4 –

the Account Agreements are untrue in light of Navy Federal's alleged conduct. (*Id.* ¶¶11, 18, 45.) They allege that reasonable consumers are likely to understand that funds for a debit card transaction are likely to be debited immediately such that they cannot be depleted by intervening transactions. (*Id.* ¶¶64–71.)

### 3. Allegations Concerning the Named Plaintiffs

Neither Lloyd, nor Plemons disputes Navy Federal's assessment of overdraft fees on their ATM withdrawals, but rather whether Navy Federal properly charged overdraft fees on debit card transactions that Navy Federal authorized into sufficient funds. (*Id.* ¶¶74, 77–78, 81–82.)

Plaintiff Lloyd alleges that she was assessed improper overdraft fees on two occasions. First, on October 27, 2014, Plaintiff Lloyd was assessed three overdrafts for six transactions which settled that day, five of which were debit card transactions initiated on or prior to October 26, 2014. (*Id.* ¶72.) Positive funds allegedly were deducted immediately for at least three of the debit card transactions for which she was assessed overdraft fees. (*Id.*) Lloyd alleges that overdraft fees for these debit card transactions were assessed solely because of a $260 ATM withdrawal she made after her debit card transactions were initiated. (*Id.* ¶73.) Second, on January 31, 2014, Lloyd was assessed three overdrafts for four transactions, three of which were debit card transactions. (*Id.* ¶75.) Positive funds were allegedly deducted for at least two of the debit card transactions on which she was assessed overdraft fees. (*Id.*) Lloyd alleges that overdraft fees for these debit card transactions were incurred solely because of a $400 ATM withdrawal she made after "some or all" of the debit card transactions were initiated. (*Id.* ¶76.)

Plaintiff Plemons alleges that he was assessed improper overdraft fees on February 18, 2014. Navy Federal allegedly assessed three overdraft fees for three transactions, two of which were debit card transactions initiated on or prior to February 15, 2014. (*Id.* ¶79.) Positive funds were allegedly deducted immediately for at least two of the debit card transactions on which Plemons was assessed

overdraft fees.  (*Id.*)  Plemons alleges that overdraft fees for these debit card transactions were assessed solely because of an $82.75 withdrawal that he made after the debit card transactions were initiated.  (*Id.* ¶80.)

## B. Procedural Background

On June 22, 2017, Plaintiffs filed a putative class action complaint against Navy Federal for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion and unjust enrichment on behalf of a national class of Navy Federal customers.  (ECF No. 1.)  On behalf of a California sub-class, Plaintiffs alleged claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, and Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, *et seq*.  (*Id.*)  Plaintiffs filed the First Amended Complaint two months later, asserting the same causes of action against Navy Federal.  (ECF No. 4.)  Navy Federal filed its motion to dismiss the FAC under Rule 12(b)(6) on September 5, 2017.  (ECF No. 9.)  After completion of the motion to dismiss briefing, Plaintiffs moved to file a notice of supplemental authority in support of their opposition to Navy Federal's motion, which the Court granted.  (ECF Nos. 16, 18.)  Pursuant to a request from the Court (ECF No. 24), both parties submitted supplemental briefing on March 13, 2018, regarding a choice of law issue raised in the motion to dismiss briefing.  (ECF Nos. 29, 30.)  The Court now turns to the merits of Navy Federal's motion to dismiss.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  For the purposes of such a motion, the court accepts as true the

allegations in the complaint and construes those allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). To survive a Rule 12(b)(6) motion, a plaintiff is required to set forth "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Factual allegations must be enough to raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 556. The court need not accept as true legal conclusions pled in the guise of factual allegations. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994). Relatedly, a pleading is insufficient if it offers only "labels and conclusion" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 676. In ruling on a 12(b)(6) motion to dismiss, a court may consider materials submitted as part of the complaint. *Lee v. City of L.A.*, 250 F.3d 668, 688–89 (9th Cir. 2001).

## III. DISCUSSION

### A. Choice of Law Issues

The Court must first determine the appropriate law that applies to Navy Federal's motion to dismiss. The Account Agreements state that Virginia law governs their interpretation and application. (Important Disclosures at 4; Debit Card Disclosure at 1.) Navy Federal argues that these provisions warrant application of Virginia law to Plaintiffs' common law claims. (ECF No. 9-1 at 14 n.4; ECF No. 29.) Plaintiffs contend that the provisions are unenforceable as to their CLRA and UCL claims.

To resolve a choice of law dispute, a federal court sitting in diversity must apply the forum state's choice-of-law rules to determine the controlling substantive law. *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005). A federal court sitting in diversity in California follows California choice-of-law rules. *Yeiser*

*Research & Dev. LLC v. Teknor Apex Co*., 281 F. Supp. 3d 1021, 1036 (S.D. Cal. 2017).  Like federal courts in the Ninth Circuit, California state courts look to the Restatement (Second) of Conflicts of Law (1971) for its choice-of-law rules.  *See In re Zukerkon*, 484 B.R. 182, 188 (9th Cir. 2012); *Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148, 1151 (Cal. 1992).  Section 187 of the Restatement applies where parties have entered into an agreement, negotiated at arm's-length, which selects a particular state's law to govern their contractual rights and duties.  *See Nedlloyd*, 834 P.2d at 1151.  To determine whether the choice-of-law provision is enforceable, a court must engage in a two-step analysis.  First, the court must determine whether: (1) the chosen state has a substantial relationship to the parties or their transaction, or (2) there is any other reasonable basis for the parties' choice of law.  *Id*. at 1152.  Second, if either is shown, the court must next determine whether the chosen state's law is contrary to a fundamental policy of California.  *Id.*  "[A] separate choice of law inquiry must be made with respect to each issue in the case."  *Wash. Mut. Bank v. Superior Court*, 15 P.3d 1071, 1081 (Cal. 2001).  The Court finds that Virginia law applies to Plaintiffs' breach of contract and related common law claims under the choice of law provisions.  However, the provisions are unenforceable as to Plaintiffs' California consumer protection statutory.

### 1. Virginia Law Applies to the Contract Claim and Related Common Law Claims

As the party advocating application of the contractual choice of law provision, Navy Federal has met its burden to establish either a substantial relationship or reasonable basis for application of Virginia law.  *See Pulte Home Corp. v. Am. Safety Indem. Co*., No. 16-cv-02567, 2017 WL 3007215, at *3 (S.D. Cal. July 14, 2017).  Plaintiffs allege that Navy Federal is headquartered and has its principal place of business in Virginia.  (FAC ¶27.)  A substantial relationship exists if a party has its principal of place of business and corporate headquarters in the chosen state.  *In re Facebook Biometric Info. Privacy Litig*., 185 F. Supp. 3d 1155, 1168–69 (N.D. Cal.

2016) (substantial relationship shown for selection of California law because party had principal executive offices and corporate headquarters in California) (citing *Peleg v. Neiman Marcus Grp., Inc.*, 140 Cal. Rptr. 3d 38 (Cal. Ct. App. 2012)); *ABF Capital Corp. v. Grove Properties Co.*, 23 Cal. Rptr. 3d 803, 810 (Cal. Ct. App. 2005) (although party was incorporated in Delaware, its principal place of business in New York met substantial relationship test for applying New York choice of law provision). The burden now shifts to Plaintiffs to show that application Virginia law would violate a fundamental policy of California. *Pulte Home Corp.*, 2017 WL 3007215, at *3. Plaintiffs readily concede in their supplemental choice of law briefing that application of Virginia law to their breach of contract claim is not contrary to a fundamental policy of California. (ECF No. 30 at 2.) Accordingly, the Court will apply Virginia law to this claim.

Virginia law also applies to Plaintiffs' claims that arise from or relate to the contract, specifically Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing, conversion, and unjust enrichment. California courts will apply an enforceable contractual choice-of-law provision to claims "arising from or related to" the contract, *Nedlloyd*, 834 P.2d at 1153. This is especially true when "the legal relationship between the[] parties emanates from th[e] Agreement and the interpretation of the Agreement will be a central issue" in the case. *Olinick v. BMG Entm't*, 42 Cal. Rptr. 3d 268, 278–79 (Cal. Ct. App. 2006) (concluding that New York law applied to FEHA and wrongful discharge claims pursuant to a choice-of-law clause in the agreement which established the parties' legal relationship). Here, both parties agree that Virginia law applies to Plaintiffs' common law claims. (ECF No. 29 at 3; ECF No. 30 at 2–3.) The Court agrees because it is evident that the legal relationship between the parties emanates from the Account Agreements, the interpretation of which is central to this case.

### 2. The Choice of Law Provision is Unenforceable as to Plaintiffs' California Consumer Protection Statutory Claims

Plaintiffs contend that the contractual choice of law provision is unenforceable as to their California statutory claims under the CLRA and UCL because Virginia law is contrary to a fundamental public policy of California. (ECF No. 30 at 3.) Navy Federal acknowledges that it generally does not assert Virginia law applies to these claims, but rather contends that the claims are "underdeveloped" and fail under Rule 12(b)(6). (ECF No. 29 at 1 n.1.)[2]

Under California law, a court must apply the law chosen by the parties unless "application of the law would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state *in the determination of the particular issue* and which . . . would be the state of the applicable law in the absence of an effective choice of law . . ." *Nedlloyd*, 834 P.2d at 1151 (emphasis added). "The mere fact that the chosen law provides greater or lesser protection than California law, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law." *Medimatch, Inc. v. Lucent Techs., Inc.*, 120 F. Supp. 2d 842, 861–62 (N.D. Cal. 2000). However, where another state's laws offer greater or lesser protection that runs contrary to a fundamental policy of California, then California law applies. *See Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031, 1041 (N.D. Cal. 2010).

Both the CLRA and UCL reflect multiple fundamental policies of the state of California aimed at protecting California consumers with which Virginia law

---

[2] Navy Federal alternatively argues that the claims "appear to be disguised breach of contract claims" and thus, to the extent Plaintiffs prove an underlying breach of contract, Virginia law applies. (ECF No. 29 at 1 n.1.) The Court rejects this argument. The CLRA and UCL are aimed at addressing particular types of harms to consumers, which undoubtedly includes harms consumers may face through their contractual relationship with a defendant. Plaintiffs may properly assert independent CLRA and UCL claims concerning such harms, which warrant their own choice of law analysis.

conflicts. *See Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1361–62 (N.D. Cal. 2007) *Aral v. Earthlink, Inc.*, 36 Cal. Rptr. 3d 229, 244 (Cal. Ct. App. 2005); *Am. Online, Inc. v. Superior Court*, 108 Cal. Rptr. 2d 699, 712–13 (Cal. Ct. App. 2001) (declining to apply Virginia law given remedial limitations on injunctive and class action relief under its consumer protection statute). Both statutes permit consumers to obtain relief via class action, whereas Virginia's consumer protection laws do not. *See Aral*, 36 Cal. Rptr. 3d at 244; *Am. Online, Inc.*, 108 Cal. Rptr. 2d at 710–11 (contrasting "the absence of any provision in the VCPA that allows suits under the act to proceed as class actions" with "the right to seek class action relief in consumer cases [that] has been extolled by California courts."); *see also Van Slyke*, 503 F. Supp. 2d at 1361 (noting that "Virginia consumer protection laws generally do not allow for class actions" and "[t]hus, there is a substantial risk that a California fundamental public policy in favor of class actions would be harmed by applying Virginia law.") The CLRA also contains an express antiwaiver provision which states that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void." CAL. CIV. CODE §1751.[3] When juxtaposed with the availability of punitive damages under the CLRA, this provision provides an additional basis for determining that the CLRA reflects a fundamental policy of California. *See Walter*, 682 F. Supp. 2d at 1041 ("Given the CLRA's anti-waiver provision and role as a deterrent and check on public harm, this Court concludes that punitive damages are in fact a 'fundamental' part of the statutory

---

[3] The CLRA's antiwaiver provision also shifts the burden to the party seeking enforcement of a contractual choice of law provision "to prove that enforcement of the forum selection clause would not result in a significant diminution of rights to California consumers." *Am. Online, Inc.*, 108 Cal. Rptr. 2d at 706; *see also Walter*, 682 F. Supp. 2d at 1038 (reading *Am. Online, Inc.* to apply to "a contractual clause [that] could have the effect of waiving legal protections that are afforded by California law and protected by an antiwaiver provision"). Navy Federal has made no attempt to meet this burden, which provides an additional basis not to apply the choice of law provision to the CLRA claims in particular.

17cv1280

scheme"), *Am. Online, Inc.*, 108 Cal. Rptr. 2d at 712 (observing the absence of punitive damages under Virginia's consumer protection law). Plaintiffs have thus shown a fundamental conflict between California law and Virginia law.

Having determined that there is a fundamental conflict, the next consideration is whether California has a materially greater interest in adjudication of the particular issues. *Kissel v. Code 42 Software, Inc.*, SACV 15-1936-JLS (KESx), 2016 WL 7647691, at *5 (C.D. Cal. April 14, 2016); *Walter*, 682 F. Supp. 2d at 1042. Courts have determined that California has a "stronger interest" in protecting *its* consumers through its chosen statutory scheme for doing so, which "permits its injured consumers not only to bring class actions to recover their losses, but also to seek punitive damages and injunctive relief in order to deter and prevent future harm to other consumers located in the state." *See Walter*, 682 F. Supp. 2d at 1042; *Oestreicher v. Alienware Corp.*, 502 F. Supp. 2d 1061, 1068 (N.D. Cal. 2007); *Van Slyke*, 503 F. Supp. 2d at 1361 ("California's own anti-deception statutes take priority . . . in a California forum" in the context of "a Virginia bank operating in California and nationwide" and "California consumers" allegedly scammed), *Am. Online, Inc.*, 108 Cal. Rptr. 2d at 713. This Court similarly concludes that California has a stronger interest in the adjudication of Plaintiffs' consumer protection claims under the CLRA and the UCL. Here, the fact that both Plaintiffs are California citizens who seek to represent a sub-class of California residents with respect to their CLRA and UCL claims "certainly increases California's interest in the litigation." *Oestreicher*, 502 F. Supp. 2d at 1068 ("[t]he state where a party to the contract is domiciled has an obvious interest in the application of its law protecting its citizens against the unfair use of superior bargaining power." (quoting *Klussman v. Cross Country Bank*, 36 Cal. Rptr. 3d 728, 740 (Cal. Ct. App. 2005))). Moreover, Plaintiffs allege that at all relevant times, they patronized Navy Federal banking centers located in California. (FAC ¶26.) Accordingly, the Court concludes that Account Agreements' choice of Virginia law is unenforceable as to Plaintiffs' CLRA and UCL claims.

## B. Breach of Contract

In their breach of contract claim, Plaintiffs allege that they contracted with Navy Federal for bank account deposit, checking, ATM, and debit card services. (FAC ¶96.) Navy Federal allegedly breached the terms of their Account Agreements by charging overdraft fees on transactions that were authorized into sufficient funds, but whose available balances were allegedly insufficient at the time the transactions settled. (*Id.* ¶¶45, 100.) Plaintiffs allege that no contractual provision authorized Navy Federal to charge overdraft fees on such transactions and Navy Federal broke its contractual promises to Plaintiffs. (*Id.* ¶¶46, 99.) Navy Federal argues that the terms of Account Agreements expressly permit its conduct and, thus, Plaintiffs' breach of contract claims are implausible. (ECF No. 9-1 at 15.) The Court does not agree that the Account Agreements speak with the clarity Navy Federal ascribes to them. Rather, they contain ambiguities which prevent dismissal at this stage. Plaintiffs offer a reasonable interpretation of the Account Agreements, which supports their breach of contract claim.

Under Virginia law, the elements of a breach of contract claim are: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach or obligation. *Hanbrack v. DRHI, Inc.*, 94 F. Supp. 3d 753, 760–61 (E.D. Va. 2015) (citing *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)). Here, Navy Federal and Plaintiffs refer to provisions in the Account Agreements (*i.e.*, Opt-In Form, the Important Disclosures, and the Debit Card Disclosure), which are multiple, related agreements as bearing upon the sufficiency of Plaintiffs' breach of contract claim. "[W]hen parties have entered into two documents relating to a business transaction, the writings will be construed together to determine the parties' intent." *First Am. Bank of Virginia v. J.S.C. Concrete Constr., Inc.*, 523 S.E.2d 496, 500 (Va. 2000). Accordingly, as the parties do, the Court construes these documents together to resolve Navy Federal's challenge.

The rules regarding dismissal of a breach of contract claim when the relevant agreement has been provided are well-settled. Where a contract's terms are unambiguous, resolution on a motion to dismiss is proper. *Stocco v. Gemological Inst. of Am., Inc*., 975 F. Supp. 2d 1170, 1179 (S.D. Cal. 2013) (citing *Bedrosian v. Tenet Healthcare Corp*., 208 F.3d 220 (9th Cir. 2000)). However, a breach of contract claim may not be dismissed for failure to state a claim if the contract's terms are ambiguous. *See Consul Ltd. v. Solide Enters., Inc*., 802 F.2d 1143, 1149 (9th Cir. 1986); *Leghorn v. Wells Fargo Bank, N.A*., 950 F. Supp. 2d 1093, 1117 (N.D. Cal. 2013); *Monaco v. Bear Stearns Residential Mortg. Corp*., 554 F. Supp. 2d 1034, 1040 (C.D. Cal. 2008) ("Where the language leaves doubt as to the parties' intent, the motion to dismiss must be denied."). Virginia law treats the question of whether a contract is ambiguous as a question of law for a court to decide. *See Noell Crane Sys. GmbH v. Noell Crane & Serv*., 677 F. Supp. 2d 852, 869 (E.D. Va. 2009) (citing *Nextel WIP Lease Corp. v. Saunders*, 666 S.E.2d 317, 321 (Va. 2008)). "Contractual language is ambiguous when it may be understood in more than one way or when it refers to two or more things at the same time. However, a contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." *Va. Fuel Corp. v. Lambert Coal Co*., 781 S.E.2d 162, 166 (Va. 2016). Even if a court determines that a contract is ambiguous as a matter of law, the ultimate resolution of contractual ambiguity is a question of fact that a court cannot decide on a motion to dismiss. *See W.C. English, Inc. v. Rummel, Klepper & Kahl, LLP*, No. 6:17-cv-0018, 2017 WL 2123878, at *3, 5 (W.D. Va. May 16, 2017) (citing *Martin Marietta Corp. v. Int'l Telecommc'ns Satellite Org*., 991 F.2d 94, 97 (4th Cir. 1992)).

The parties dispute whether the Account Agreements are ambiguous. Plaintiffs point to the Opt-In Form's provision that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." (FAC ¶38 (quoting Opt-In Form); ECF No. 11 at 8.) This provision is undoubtedly central to Plaintiffs' breach of contract claim. (*See, e.g*., FAC ¶¶2, 12–

13, 18, 20, 31, 38–40, 100.) Plaintiffs argue that this provision is ambiguous because the term "to cover" is undefined. (ECF No. 11 at 12.) Although Navy Federal disputes the existence of contractual ambiguity in the Account Agreements based on other provisions, it never addresses whether the Opt-In Form's key provision defining when an overdraft occurs is ambiguous.

Based on a review of the Account Agreements, the Court finds that the term "to cover" is ambiguous. The Account Agreements do not clearly identify how funds sequestered for a transaction authorized with positive funds are to be used when the transaction is paid. If the term "to cover" means that funds sequestered from a positive account balance will be used to pay for the transaction when it settles, then it cannot be said that Navy Federal actually pays for the transaction and, under the Account Agreements, no overdraft fee could be charged. However, if the term "to cover" does not mean that sequestered funds are to be used to pay for the transaction when it settles, then Navy Federal presumably does pay for the transaction, which triggers its contractual authority to assess an overdraft fee on the transaction. The Court cannot say that the Account Agreements clearly foreclose either interpretation. Moreover, the provision in which "to cover" appears contains another ambiguity. The provision uses the term "transaction" with no qualification. The Opt-In Form can thus be fairly read to include either a consumer's transaction with a merchant (*i.e.*, authorization of the transaction) or Navy Federal's transaction with a merchant (*i.e.*, settlement with the merchant). The former reading would lend support to Plaintiffs' breach of contract claim by tethering Navy Federal's overdraft determination to the point when Navy Federal authorizes the transaction.

In the face of contractual ambiguities, Plaintiffs offer a reasonable interpretation of the term "to cover", in the context of other provisions in the Account Agreements, which would foreclose overdraft fees on the debit card transactions at issue here. First, Plaintiffs point to the hold process described in the Debit Card Disclosure, which expressly provides that a temporary hold is immediately placed on

the account at the time of a transaction and is removed when the transaction posts to the account or within three days. (ECF No. 11 at 4 (citing FAC ¶17).) According to Plaintiffs, if funds are held for a transaction authorized by Navy Federal into positive funds, then those funds cannot properly be consumed by an intervening ATM withdrawal. This is because the hold is only removed when the transaction posts to an account and, thus, a previously posted ATM withdrawal cannot affect them. (ECF No. 11 at 8.) Second, Plaintiffs point to a provision in the Account Agreements which shows that debit card transactions are instantaneously authorized and approved and, further, that authorization and payment are linked. (ECF No. 11 at 5 (citing FAC ¶¶14–16).) Plaintiffs point to the provision appearing in both the Opt-In Form and Important Disclosures which states that "[w]e pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined and/or your check/ACH will be returned." (ECF No. 11 at 11; *see also* FAC ¶16; Important Disclosures at 2; Debit Card Disclosure at 1.) A reasonable reading of this provision is that it links authorization of a transaction with payment of the transaction, and particularly with respect to Navy Federal's authorization and payment of a transaction that results in an overdraft. If this is the case, then whether a transaction is an overdraft that Navy Federal pays is determined at authorization. Consequently, a transaction that was not authorized as an overdraft, such as those the Plaintiffs allege, would not incur an overdraft fee.

To refute Plaintiffs' interpretation, Navy Federal points to other provisions of the Account Agreements which it contends "make plain that an overdraft occurs 'on the date the transaction is paid.'" (ECF No. 9-1 at 15 (citing Debit Card Disclosure at 1).) Navy Federal points to provisions in the Opt-In Form, including: the provision on which Plaintiffs rely (*i.e.*, "[a]n overdraft occurs when . . . we pay it anyway"), "[w]e will charge a fee of $20 each time we pay an overdraft", and "[w]e pay overdrafts at our discretion, . . ." (ECF No. 9-1 at 15–16.) None of these provisions,

however, facially identifies the precise moment *when* Navy Federal pays an overdraft. The provisions do not identify if Navy Federal pays an overdraft on the date Navy Federal authorizes a consumer transaction with a merchant, pays a merchant for a debit card transaction, or that Navy Federal makes an overdraft determination on the date. Implicitly recognizing this, Navy Federal seeks to link its overdraft assessment to the date when a transaction posts to an account, presumably when the transaction settles. Navy Federal relies on a provision in the Important Disclosures which states that: "Optional Overdraft Protection Service is not a loan and must be repaid promptly and cannot extend beyond 30 days of the initial *transaction posting*." (*Id.* at 16 (citing Important Disclosures at 3) (emphasis in motion).) It is not clear that this provision supports Navy Federal. By qualifying the term "transaction" with the word "initial," the provision could be read to mean that an overdraft occurs *prior* to some final posting, *i.e.* prior to when the transaction settles, which would lend support to Plaintiffs' position.

Navy Federal also construes Plaintiffs' breach of contract claims as concerning the "order in which transactions are actually initiated." (ECF No. 9-1 at 16 (citing FAC ¶71).) In particular, the Important Disclosures indicate that all credits post to an account first, followed by ATM withdrawals, and debit card transactions thereafter. (Important Disclosures at 3.) Navy Federal argues that because the parties expressly agreed that Navy Federal would post transactions to customer accounts in a specified order, a breach of contract claim based on this allegation is implausible. Navy Federal's selective reading omits that Plaintiffs' relevant allegation concerns "a consumer perception that debit card transactions reduce an available balance in a specified order—namely the order the transactions are actually initiated . . ." (FAC ¶71.) This allegation and the surrounding allegations (*id.* ¶¶64–71)—all of which concern the perceptions of "reasonable consumers"—appear to actually concern whether Navy Federal's conduct might violate the UCL. However, accepting that Plaintiffs' breach of contract claim implicates the posting order, the Court is not

persuaded that the posting order forecloses Plaintiffs' claim. The order in which transactions post to an account does not resolve whether funds previously sequestered for a transaction authorized and approved into positive funds are used "to cover" that transaction when it settles. As Plaintiffs observe, if a temporary hold lasts until the transaction posts, then their previously posted ATM withdrawals could not consume funds sequestered from positive funds. (ECF No. 11 at 10.)

Lastly, Navy Federal argues that dismissal of Plaintiffs' breach of contract claim is warranted based on the decision in *Roberts v. Capital One, N.A.*, 16 Civ. 4841 (LGS), 2017 WL 1750445 (S.D.N.Y. May 4, 2017). In *Roberts*, the plaintiffs alleged that their account agreements with the defendant bank foreclosed the defendant from charging overdraft fees if a customer's balance was positive at the time a merchant requested purchase authorization, but negative when the merchant was paid. *Id.* at *3. This is the thrust of Plaintiffs' breach of contract claim here. The *Roberts* court found that the plaintiffs' interpretation of their account agreements was "unreasonable as a matter of law" because (1) no provision required the defendant to make an overdraft determination at the time of purchase authorization and (2) the agreements expressly provided that an overdraft occurred when the defendant paid, rather than authorized a transaction. *Id.* Navy Federal's reliance on the district court decision in *Roberts*, however, is betrayed by the Second Circuit's reversal of dismissal of the contract claims. *See Roberts v. Capital One, N.A.*, No. 17-1762, — Fed. App'x —, 2017 WL 5952720, at *2–3 (2d Cir. Dec. 1, 2017).[4] The Second Circuit determined that a "key provision" of the account agreements which purported to define the term "overdraft" failed to provide "a definite and precise meaning" of the term and it was reasonable to understand the term to mean the defendant's election to make a payment at the time of authorization *or* at the time of

---

[4] Plaintiffs' notice of supplemental authority concerned the Second Circuit's decision on appeal. (ECF No. 16.)

settlement. *Id.* at *2.[5] Of particular relevance, the Second Circuit rejected the defendant bank's reliance on a contractual provision identical to the one on which Plaintiffs rely here: "[a]n Overdraft occurs when you do not have enough money in your designated account to cover a transaction, but we pay it anyway." *Id.* at *3. The Second Circuit determined that the provision's use of the term "transaction" could plausibly refer to the consumer's transaction with the merchant, rather than the bank's settlement of the transaction with a merchant. *Id.* Although the Second Circuit's decision is not binding, it lends persuasive force to Plaintiffs' position that the Account Agreements here are ambiguous as a matter of law given certain nearly identical contractual provisions and the use of imprecise terms.

Moreover, as Plaintiffs observe in opposition (ECF No. 11 at 12–16), federal courts have generally denied motions to dismiss breach of contract claims involving imposition of overdraft fees due to contractual ambiguity. *See*, *e.g.*, *Ramirez v. Baxter Credit Union*, No. 16-cv-03765-SI, 2017 WL 1064991, at *5 (N.D. Cal. Mar. 21, 2017) (denying dismissal of breach of contract claim due to contractual ambiguities regarding method defendant used to determine a customer's balance for assessing overdrafts); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 854–55 (W.D. Mich. 2016) (denying motion to dismiss where account agreement did not define the term account or state how sufficient funds were determined for the purposes of overdrafts); *Gunter v. United Fed. Credit Union*, No. 3:15-cv-00483-MMD-WGC, 2016 WL 3457009, at *3 (D. Nev. June 22, 2016) (denying to motion to dismiss where account agreements regarding overdrafts were ambiguous and

---

[5] The specific "key provision" in *Roberts* was: "We may in our sole discretion, and without obligation, elect to pay checks and other items drawn on your deposit account or to permit automatic bill payments and withdrawals against your account for an amount in excess of your available balance (an 'Overdraft')." *Roberts*, — Fed. App'x —, 2017 WL 5952720, at *2. Like the key provision in *Roberts*, the key provision in this case attempts to define when an overdraft occurs, and does so imprecisely.

plaintiff offered a plausible interpretation); *In re TD Bank*, *N.A.*, 150 F. Supp. 3d 593, 624 (D.S.C. 2015) (denying motion to dismiss breach of contract claim in part because of "imprecise use of terms"); *but see Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1, 9–13 (D.D.C. 2016) (dismissing breach of contract claim on the ground that the relevant agreements unambiguously conveyed that the credit union would impose overdraft fees on debit transactions that overdraft the available balance).

Here, the Court is persuaded that the ambiguities in the Account Agreements prevent dismissal of Plaintiffs' breach of contract claims at this stage of the litigation. At this juncture, Plaintiffs have alleged a reasonable interpretation of that Account Agreements and conduct that would violate that interpretation. The meaning of the Account Agreements is best ascertained through the discovery process. Accordingly, the Court denies Navy Federal's motion to dismiss the breach of contract claim.

### C.     Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs bring a claim against Navy Federal for breach of the implied covenant of good faith and fair dealing based on Navy Federal's alleged overdraft policies and practices. (FAC ¶107.) They allege that Navy Federal assessed overdraft fees by abusing contractual discretion in its interpretation of the undefined term "to cover" and by authorizing later transactions that consume funds previously set aside. (*Id.* ¶¶107–109.) Navy Federal asserts that this claim must be dismissed because it is duplicative of Plaintiffs' breach of contract claim and improperly seeks to rewrite contractual provisions. (ECF No. 9-1 at 17.)

Under Virginia Law, every contract carries with it an implied covenant of good faith and fair dealing. *Eplus Tech. Inc. v. AMTRAK*, 407 F. Supp. 2d 758, 762 (E.D. Va. 2005). To assert an implied covenant claim, a plaintiff must allege (1) a contractual relationship between the parties and (2) a breach of the implied covenant. *SunTrust Mortg., Inc. v. Mortgages Unlimited, Inc*., No. 3:11-cv-861-HEH, 2012 WL 1942056, at *3 (E.D. Va. May 29, 2012) (quoting *Enomoto v. Space Adventures, Ltd.*,

624 F. Supp. 2d 443, 450 (E.D. Va. 2009)).  Under Virginia law, the duty of good faith under the covenant "defies a fast and true definition, but "at a minimum . . . it includes 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party [to a contract].'" *SunTrust Mortg., Inc.*, 2012 WL 1942056, at *3 (quoting *SunTrust Morg., Inc. v. United Guar. Residential Ins. Co. of N. Carolina*, 806 F. Supp. 2d 872, 895 (E.D. Va. 2011); RESTATEMENT (SECOND) OF CONTRACTS §205 cmt. a (1981)).  As Navy Federal recognizes, a breach of the implied covenant is not treated as an independent cause of action, but rather as one for breach of contract.  *See Rogers v. Deane*, 992 F. Supp. 2d 621, 633 (E.D. Va. 2014); *Eplus Tech. Inc.*, 407 F. Supp. 2d at 762; *Frank Brunckhorst Co., L.L.C. v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 465 (E.D. Va. 2008).

Several courts have dismissed implied covenant claims as "duplicative" when a party has also asserted a breach of contract claim.  *See Rogers*, 992 F. Supp. 2d at 633 ("Where there is a claim for breach of contract, the inclusion of a claim for breach of the implied covenant . . . as *a separate claim* is duplicative. . .") (emphasis added); *Want v. St. Martins Press LLC*, No. 1:12-cv-908, 2012 WL 5398887, at *4 (E.D. Va. Nov. 1, 2012) (dismissing implied covenant claim on the ground that the covenant "does not provide an independent basis for recovery and only duplicates a breach of contract claim.").  Despite dismissing the claims as "duplicative" of a breach of contract claim, these cases recognize that Virginia law does not recognize an independent claim for breach of the implied covenant.  Other courts have dismissed separately pleaded implied covenant claims as merely an improper "attempt to plead a separate tort cause of action for breach of the implied covenant" which does not exist under Virginia law.  *Jackson v. Ocwen Loan Servicing, LLC*, No. 3:15-cv-238, 2016 WL 1337263, at *12 (E.D. Va. Mar. 31, 2016); *Smith v. Flagstar Bank, F.S.B.*, No. 3:14-cv-741, 2015 WL 1221270, at *6 (E.D. Va. Mar. 17, 2015) ("Plaintiff has attempted to assert a separate cause of action for breach of the implied duty of good faith, and thus he has not stated a claim upon which relief may be granted under

Virginia law."); *Jones v. Fulton Bank, N.A.*, No. 3:13-cv-126, 2013 WL 3788428, at *7 (E.D. Va. July 18, 2013), *aff'd*, 565 Fed. App'x 251, 253 (4th Cir. 2014) (plaintiffs' implied covenant "claim fails because it was pled as a separate tort claim").

Here, Plaintiffs have pleaded their implied covenant claims separately from their breach of contract claim. (*Compare* FAC ¶¶95–102 (breach of contract as first claim for relief) *with id.* ¶¶103–111 (breach of implied covenant as second claim for relief).) Because Virginia law does not recognize such an independent cause of action, the implied covenant claim is subject to dismissal on this basis. The Court accordingly grants Navy Federal's motion to dismiss the implied covenant claim on this ground.

However, courts permit parties to plead breach of the implied covenant as part of a breach of contract claim, or recognize that parties may do so. *See, e.g., Goodrich Corp. v. BaySys Techs., LLC*, 873 F. Supp. 2d 736, 742 (E.D. Va. 2012) (permitting breach of implied covenant to proceed where it was "incorporated under the umbrella of a breach of contract claim" and not pleaded as "an independent tort"); *cf. Jackson*, 2016 WL 1337263, at *12 n.14 ("The [plaintiffs] do not couch their claim as a breach of contract") (dismissing independently pleaded implied covenant claim). Because a breach of the implied covenant may be pleaded as breach of contract under Virginia law, there may be a basis to permit Plaintiffs to amend the FAC.

Navy Federal argues that Plaintiffs' claim for breach of the implied covenant otherwise fails because of the express terms of the Account Agreements. Whereas Plaintiffs allege that Navy Federal abused its contractual discretion in its interpretation of the term "to cover" (ECF No. 11 at 17), Navy Federal asserts that "[i]t applied the contract according to its terms" (ECF No. 12 at 8.) Whereas Plaintiffs allege that Navy Federal also abused its contractual discretion to authorize later-in-time transactions that would consume previously held funds (ECF No. 11 at 17), Navy Federal asserts it authorized transactions in a manner consistent with the

Account Agreements (ECF No. 12 at 8). Navy Federal contends that Plaintiffs seek to rewrite the Account Agreements because the agreements "do not foreclose Navy Federal from charging overdraft fees." (ECF No. 9-1 at 17.) The Court is persuaded that Plaintiffs may press a breach of contract claim based on Navy Federal's alleged abuse of contractual discretion in contravention of the implied covenant.

Under Virginia law, "when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights." *Ward's Equip. v. New Holland N. Am., Inc*., 493 S.E.2d 516, 520 (Va. 1997). The implied covenant "cannot be invoked to undercut a party's express contractual rights", nor does it "compel a party to take affirmation action not otherwise required under the contract" or "establish independent duties not otherwise agreed upon by the parties." *Monton v. America's Servicing Co*., No. 2:11-cv-678, 2012 WL 3596519, at *7 (E.D. Va. Aug. 20, 2012) (citing *De Vera v. Bank of Am., N.A*., No. 2:12-cv-17, 2012 WL 2400627, at *3 (E.D. Va. June 25, 2012)); *McInnis v. BAC Home Loan Servicing, LP*, 2:11CV468, 2012 WL 383590, at *8 (E.D. Va. Jan. 13, 2012) ("The implied covenant cannot "rewrit[e] an unambiguous contract in order to create terms that do not otherwise exist.") (quoting *Ward's Equip.*, 493 S.E.2d at 520), *report and recommendation adopted by,* 2012 WL 368282 (E.D. Va. Feb. 3, 2012). However, Virginia law recognizes that "a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested *solely* in that party." *Va. Vermiculite, Ltd. v. W.R. Grace & Co*., 156 F.3d 535, 542 (4th Cir. 1998) (reversing dismissal of implied covenant claim under Virginia law) (emphasis added).

Here, Plaintiffs do not challenge Navy Federal's contractual rights. Rather, they identify contractual provisions that imbue Navy Federal with discretion. They allege that Navy Federal exploited an undefined contractual term and a provision that on its face grants "discretion" to knowingly authorize transactions to consume funds previously set aside and extract additional overdraft fees. (FAC ¶¶60–63, 107–108; *see also* Opt-In Form.) The Court can reasonably infer that Navy Federal exercised

its contractual discretion in bad faith, such that it breached the Account Agreements. *See Goodrich Corp.*, 873 F. Supp. 2d at 742 (sustaining breach of contract claim premised on breach of the implied covenant because the allegations "all evidence [defendant's] bad faith"); *cf. Bennett v. Bank of Am., N.A.*, No. 3:12CV34-HEH, 2012 WL 1354546, at *11 (E.D. Va. April 18, 2012) (dismissing implied covenant claim because "[p]laintiff does not allege that [defendant] took any actions from which the Court might reasonably infer that [defendant] exercised its contractual discretion in bad faith."). Multiple federal courts have recognized that contractual provisions providing a financial institution with discretion over overdraft fees provides a basis for a breach of the implied covenant. *See, e.g., In re HSBC Bank*, 1 F. Supp. 3d 34, 54 (E.D.N.Y. 2014) (permitting claim to proceed despite HSBC's argument that it had contractual authority to post debit transactions from high to low), *Gutierrez v. Wells Fargo*, 622 F. Supp. 2d 946, 954 (N.D. Cal. 2009) (permitting claim to proceed despite Wells Fargo's argument that it had contractual authority to post items to checking account in any order the bank chose). In line with the persuasive approach of these courts and in view of Virginia law, the Court grants Plaintiffs leave to amend their breach of contract claim to add therein the allegations regarding a breach of the implied covenant of good faith and fair dealing.

### D. Conversion

Plaintiffs press a conversion claim in which they allege that Navy Federal "wrongfully collected" amounts for overdraft fees from them without proper authorization. (FAC ¶114; *see also* ECF No. 11 at 24.) Plaintiffs allege that Navy Federal continues to retain these funds, which Plaintiffs properly own and to which they have right to immediate possession. (FAC ¶¶116–119.) As a threshold matter, Navy Federal argues that this claim must be dismissed on the ground that Plaintiffs may not pursue a claim based on conversion of money under Virginia law. The Court does not agree.

Under Virginia law, "[c]onversion is the wrongful assumption or exercise of

the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights." *Economopoulos v. Kolaitis*, 528 S.E.2d 714, 719 (Va. 2000). Virginia law generally provides that "money cannot be the subject of conversion, only tangible personal property may be converted." (ECF No. 9-1 at 18 (quoting *Jones v. Bank of Am. Corp.*, 2010 WL 6605789, at *5 (E.D. Va. Aug. 24, 2010).). As both parties recognize, however, there is an exception. (ECF No. 9-1 at 19, ECF No. 11 at 23–24.) "[M]oney can be the basis of a conversion claim" if it is "in the form of *an identifiable fund . . .*" *Jones*, 2010 WL 6605789, at *5 (emphasis added). For example, the Virginia Supreme Court has permitted a conversion claim based on settlement proceeds. *PGI, Inc v. Rathe Productions*, Inc., 576 S.E.2d 438, 443 (Va. 2003). Courts have also permitted conversion claims under Virginia law for funds deposited into a bank account and amounts placed into an escrow account. *See Jones*, 2010 WL 6605789, at *5; *Raleigh Radiology, Inc. v. Eggleston & Eggleston, P.C.*, 2009 WL 3764092, at *4 (W.D. Va. Nov. 10, 2009) (funds deposited into bank account). Here, Plaintiffs plead specific and identifiable sums of money that were allegedly converted—namely each $20 overdraft fee they allege Navy Federal improperly assessed and the funds to satisfy the charges. (FAC ¶¶72, 75, 79, 114–15, 120.) Thus, their conversion claim is not subject to dismissal on this basis.

Plaintiffs must nevertheless satisfy the requirements to plead conversion under Virginia law: (1) their ownership or right to possession of property at the time of the conversion, and (2) the defendant's wrongful exercise of dominion or control over the plaintiff's property, depriving the plaintiff of possession. *Pro-Concepts, LLC v. Resh*, No. 2:12-cv-573, 2014 WL 549294, at *16 (E.D. Va. Feb. 11, 2014) (citing *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 457 (E.D. Va. 2009)); *Jones*, 2010 WL 6605789, at *5. Navy Federal disputes that Plaintiffs have plausibly pleaded either element.

Navy Federal argues that Plaintiffs' conversion claim fails to plead the first element of a conversion claim because once Plaintiffs deposited funds with Navy

Federal, title to those funds immediately passed to Navy Federal. (ECF No. 9-1 at 18.) Plaintiffs argue that their conversion claims may proceed based on the right to immediate possession of the allegedly converted property, not solely on ownership. (ECF No. 11 at 22–23.) Under Virginia law, the "general rule is that once funds are deposited in a bank account, the funds become the property of the bank." *Terry v. Bank of Am., N.A.*, 350 F. Supp. 2d 727, 730 (W.D. Va. 2004) (citing *Bernardini v. Central Nat'l Bank*, 290 S.E.2d 863, 864 (Va. 1982).[6] Federal courts have dismissed conversion claims under Virginia law on the basis of this general rule when allegations of possessory interest were conclusory or foreclosed. *See Hughes v. Bank of Am.*, No. 5:07CV00109, 2008 WL 857059, at *2 (W.D. Va. Mar. 31, 2008) (citing *Bernardini*, 290 S.E.2d at 864) (dismissal where plaintiff conclusory alleged ownership of deposited funds and a "superior possessory right to" them); *Terry*, 350 F. Supp. 2d at 730 (dismissal where there was no indication that an SEC freeze order concerning deposited funds entitled plaintiffs to immediate possession of the funds); *Jones*, 2010 WL 6605789, at *5–6 (finding that plaintiff failed to plausibly plead right to immediate possession of funds placed in escrow because she had contractual obligation to make payments). These decisions implicitly recognize that a conversion claim may proceed when there are plausible allegations of a right to immediate possession of converted funds, notwithstanding the general rule.

The Court is persuaded that Plaintiffs have plausibly alleged the first element of a conversion claim under Virginia law. Plaintiffs allege that they have the right to immediate possession of the funds Navy Federal allegedly converted "without authorization" and that Navy Federal has interfered with this right. (FAC ¶¶115–

---

[6] This general rule is not unique to Virginia law, but rather exists across multiple jurisdictions. *See, e.g., Crocker-Citizens Nat' Bank v. Control Metals Corp.*, 566 F.2d 631, 637–38 (9th Cir. 1978) (under California law); *In re HSBC Bank, USA, N.A., Debit Card Overdraft Litig.*, 1 F. Supp. 3d 34, 53 (S.D.N.Y. 2014) (under New York law); *Maurello v. Broadway Bank & Trust Co.*, 176 A. 391, 394 (N.J. 1935) (under New Jersey law).

119.) "Plaintiffs unquestionably had the right to possess the funds in their bank accounts upon demand to the bank, and they have alleged that Defendants wrongfully took funds from their accounts so that Plaintiffs were unable to possess and use those funds." *In re Checking Account Overdraft Litig*., 694 F. Supp. 2d 1302, 1323 (S.D. Fla. 2010) (collecting case law from various states permitting conversion claims based on right to possess funds in bank account notwithstanding general rule regarding bank-depositor relationship); *see also In re TD Bank, N.A*., 150 F. Supp. 3d 593, 630 (D.S.C. 2015) (denying motion to dismiss conversion claim under general rule because "plaintiffs retain a right to immediate possession of the property at any time"); *Metro. Life Ins. Co. v. Hunter*, No. 1:12-cv-01009 (GBL/IDD), 2013 U.S. Dist. LEXIS 187375, at *12 (E.D. Va. Mar. 5, 2013) (finding that plaintiff, as administrator of insurance proceeds erroneously paid to defendant, had pleaded right to possession of those proceeds). Navy Federal identifies no basis under the Account Agreements which would foreclose this allegation, nor can the Court identify one at the motion to dismiss stage based on the contractual ambiguities previously discussed. The Court thus follows the position of "[t]he majority of federal courts that have addressed this question in the context of overdraft fees [to find] that plaintiffs may bring a conversion claim for fees that are alleged to have been wrongfully assessed . . ." *In re TD Bank, N.A*., 150 F. Supp. 3d at 630.

Navy Federal further argues that Plaintiffs cannot plausibly allege a wrongful act necessary for a conversion claim "if Navy Federal complied with the parties' agreements concerning overdrafts." (ECF No. 9-1 at 19.) Resolution of this issue is not appropriate as the Court has denied Navy Federal's motion to dismiss Plaintiffs' breach of contract claim based on contractual ambiguities and Plaintiffs' factual allegations regarding breach of contract. *See, e.g*., *In re TD Bank, N.A*., 150 F. Supp. 3d at 630 (denying dismissal of conversion claim in light of court's denial of breach of contract claim dismissal); *White v. Wachovia Bank, N.A*., 563 F. Supp. 2d 1358, 1371 (N.D. Ga. 2008) (same). Moreover, Plaintiffs have pleaded that Navy Federal

– 27 –

exercised its contractual discretion in bad faith to define the phrase "to cover" in a manner that caused them to incur additional overdraft fees, which would support a determination that Navy Federal wrongfully charged the challenged overdraft fees. *See In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1323 (denying motion to dismiss conversion claims where plaintiffs alleged sufficient facts regarding defendant bank's abuse of contractual discretion to impose overdraft fees). Accordingly, the Court denies Navy Federal's motion to dismiss Plaintiffs' conversion claim.

### E.     Unjust Enrichment

In their unjust enrichment claim, Plaintiffs allege that they conferred a benefit on Navy Federal "from the imposition of [overdraft fees]" which Navy Federal knowingly received and continues to retain. (FAC ¶¶127–130.) Navy Federal argues that this claim must be dismissed because it concerns an issue governed by the Account Agreements. (ECF No. 9-1 at 19.) The Court agrees.

To state an unjust enrichment claim under Virginia law, a plaintiff must plead that: "(1) he conferred a benefit on [the defendant]; (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the benefit without paying for its value." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 165–66 (4th Cir. 2012) (quoting *Schmidt v. Household Finance Corp.*, *II*, 661 S.E.2d 834, 838 (Va. 2008)). However, there is an important limitation: unjust enrichment is "based on a quasi-contractual theory that is premised on the *lack of a contract between the parties*." *Run Them Sweet, LLC v. CPA Global Ltd.*, 224 F. Supp. 3d 462, 469 (E.D. Va. 2016) (citing *Dr. William E.S. Flory Small Bus. Dev. Ctr., Inc. v. Commonwealth*, 541 S.E.2d 915, 918 (Va. 2001)) (emphasis added). It is only when there is no contract or the contract does not cover the particular issue that "equity will effect a 'contract implied in law'. . ." to permit an unjust enrichment claim. *Guardian Pharm. of E. NC, LLC v. Webster City Healthcare*, No. 2:12-cv-00037, 2013 WL 277771, at *8 (W.D. Va. Jan. 24,

– 28 –

2013) (quoting *Po River Sewer Co. v. Indian Acres Club of Thornburg, Inc*., 495 S.E.2d 478, 482 (Va. 1998)); *see also Maggard v. Essar Global Ltd*., 16 F. Supp. 3d 676, 688 (W.D. Va. 2014) ( "[i]f an express contract exists but does not cover the services rendered, a cause of action for unjust enrichment remains available."). On the other hand, the existence of an express contract governing the particular issue precludes an unjust enrichment claim. *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988) (affirming dismissal of unjust enrichment claim asserted under Virginia law "[b]ecause there is an express contract in this case"); *Run Them Sweet, LLC*, 224 F. Supp. 3d at 469 ("Virginia law holds that where, as here, a contract exists, there can be no recovery . . . . [a]s a result, plaintiffs' unjust enrichment claim must be dismissed because the parties unquestionably have an express contract[]."); *S. Biscuit Co., Inc. v. Lloyd*, 6 S.E.2d 601, 606 (Va. 1940) ("[A]n express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing the same subject matter.").

Here, the Account Agreements undoubtedly govern the subject matter of overdraft fees, including the assessment of the fees, the amount of the fees and the consequences of failure to pay an overdraft fee. (*See generally* Account Agreements.) Plaintiffs' unjust enrichment claims are therefore subject to dismissal. *See Lion Assocs., LLC v. Swiftships Shipbuilders, LLC*, 475 Fed. App'x 496, 503 (4th Cir. 2012) (affirming dismissal of unjust enrichment claim under Virginia law "because an express contract exists that covers the services it rendered"); *Dickman v. Banner Life Ins. Co*., No. WMN-16-192, 2016 WL 7383869, at *7 (D. Md. Dec. 21, 2016) (dismissing unjust enrichment claim under Virginia law based on plaintiffs' payments of premiums to defendant because "[p]laintiffs' payments . . . clearly fall within the scope of the insurance contracts. . .").

Plaintiffs nevertheless assert that they may plead their unjust enrichment claims in the alternative to their breach of contract claims. (ECF No. 11 at 24.) There

17cv1280

is disagreement about whether a plaintiff, at the pleading stage, may assert alternative claims for unjust enrichment and breach of contract. *McPike v. Zero Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 809 (E.D. Va. 2017). Some courts permit alternative unjust enrichment and breach of contract claims under one of two approaches. This Court, however, is not persuaded that either approach provides a basis for Plaintiffs to plead an alternative unjust enrichment claim here.

First, courts generally permit alternative pleading when a defendant does not concede the existence of a valid contract. *See In re Bay Vista of Va.*, No. 2:09cv46, 2009 WL 2900040, at *6 (E.D. Va. June 2, 2009) (permitting unjust enrichment claim because "[d]efendants have not conceded the existence of an enforceable contract."); *Atl. Credit & Fin. Special Fin. Unit, LLC v. MBNA Am. Bank, N.A.*, No. Civ. A. 700CV00846, 2001 WL 856704, at *5 n.6 (W.D. VA. June 4, 2001) ("It is proper to allege an alternative ground for recovery, which might provide a basis for relief should [the defendant] successfully attack the validity of the agreement."); *see also McPike*, 280 F. Supp. 3d at 810 (stating more broadly that "the rationale for alternative pleading disappears when *neither* party contests the applicability or validity of the contract" (emphasis added)). Alternative pleading is appropriate in such a circumstance because equity could still permissibly effect a quasi-contract between the parties. *McPike*, 280 F. Supp. 3d at 810. However, Navy Federal does not challenge that a valid express agreement covers the conduct Plaintiffs allege and indeed points to the Account Agreements. (ECF No. 9-1 at 19.)

Second, courts have permitted alternative pleading on the basis of Federal Rule of Civil Procedure 8(d). *See Harrell v. Colonial Holdings, Inc.*, 923 F. Supp. 2d 813, 826–27 (E.D. Va. Feb. 12, 2013) ("[Rule] 8(d)(2) specifically permits alternative theories of recovery, regardless of whether 'in a single count . . . or in separate ones.'") (permitting unjust enrichment claim in the alternative based on different factual allegations). Although Rule 8 permits notice pleading of alternative theories of recovery, a Rule 12(b)(6) challenge nevertheless requires the Court to assess the

sufficiency of all claims challenged, including the plausibility of the factual allegations underlying them. FED. R. CIV. P. 12(b)(6). In conducting its assessment, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Iqbal*, 556 U.S. at 678. Here, Plaintiffs allege that their unjust enrichment claims "exclud[e] statements which allege that valid contractual terms govern the challenged conduct." (FAC ¶124.) This conclusory allegation, however, is belied by the express terms of the Account Agreement and the Court need not accept it. *See Addison v. CNX Gas Co., LLC*, No. 1:10cv00065, 2011 WL 4553090, at *18 (W.D. Va. May 13, 2011) ("The Complaint in this case specifically alleges that the parties' relationship, rights and obligations are set out in a valid express contract, the Lease. That being the case, I find that [plaintiff] cannot recover for unjust enrichment. . .").[7] Accordingly, the Court grants Navy Federal's motion to dismiss Plaintiffs' unjust enrichment claims with prejudice.

### F. California UCL "Fraudulent" Claim

The FAC alleges a claim under the UCL on behalf of a California sub-class on the ground that Navy Federal "falsely indicat[ed] in account documents that [overdraft fees] will not be charged when sufficient funds exist to 'cover' transactions." (FAC ¶135.) The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE §17200. Any of these prongs may support a UCL cause of action. *Cel-Tech Commc'ns, Inc. v. Los Angeles*

---

[7] Federal courts have similarly dismissed unjust enrichment claims when a valid, express contract governs the relationship between the parties despite an attempt to plead the claim in the alternative. *See, e.g.*, *Steinberg v. Provident Funding Assocs., L.P.*, No. 15-cv-03743-JST, 2016 WL 3361815, at *4 (N.D. Cal. June 17, 2016) (concluding that plaintiffs could not plead a claim for unjust enrichment under Florida law where it was uncontested that an express contract existed); *Corchado v. BAC Home Loans Servicing, LP*, No. 2:10-CV-01860-KJD-RJJ, 2011 WL 4573905, at *4 (D. Nev. Sept. 29, 2011) (dismissing unjust enrichment claim under Nevada law because there was "an express contract that governs the relationship between the parties" despite plaintiff's "attempt at alternative pleading").

*Cellular Tel. Co*., 973 P.2d 527, 539 (Cal. 1999). Plaintiffs' claim is asserted under the UCL's fraudulent prong. Navy Federal argues that, as pleaded, the claim lacks particularity, does not identify an actionable representation, and inadequately pleads reliance on any alleged misrepresentation. (ECF No. 9-1 at 20–21.)

A UCL claim under the fraudulent prong is distinct from common law fraud. It does not require actual falsity, knowledge of falsity, or reasonable reliance by the alleged victim. *See Stearns v. Ticketmaster Corp*., 655 F.3d 1013, 1020 (9th Cir. 2011) (citing *In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009)). "A UCL plaintiff need not show that he or others were actually deceived or confused by the conduct or business practice in question." *Flores v. EMC Mortg. Co*., 997 F. Supp. 2d 1088, 1119 (E.D. Cal. 2014) (citations and internal quotations omitted). Rather, "[t]he determination as to whether a business practice is deceptive is based on the likely effect such [a] practice would have on a reasonable consumer." *Morgan v. AT&T Wireless Services, Inc*., 99 Cal. Rptr. 3d 768, 786 (Cal. Ct. App. 2009). Thus, to state a claim under the UCL's "fraud" prong, a plaintiff must allege facts showing that members of the public are likely to be deceived by the alleged fraudulent business practice. *In re Sony Grand WEGA KDF-E A10/A20 Series Rear Projection HDTV TV Litig*., 758 F. Supp. 2d 1077, 1092 (S.D. Cal. 2010) [hereinafter "*In re Sony*"] (citing *Puentes v. Wells Fargo Home Mortg., Inc*., 72 Cal. Rptr. 3d 903, 909 (Cal. Ct. App. 2008)).

UCL claims grounded in fraud must also satisfy the heightened pleading strictures of Rule 9(b) for fraud claims. FED. R. CIV. P. 9(b) ("In alleging fraud . . ., a party must state with particularity the circumstances constituting fraud or mistake. . ."); *Kearns v. Ford Moto Co*., 567 F.3d 1120, 1125 (9th Cir. 2009) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102–05 (9th Cir. 2003)). The purpose of Rule 9(b)'s pleading requirements is "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v.*

*KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).  A plaintiff generally "must include a description of the 'time, place, and specific content of the false representations as well as the parties to the misrepresentations.'"  *In re Sony*, 758 F. Supp. 2d at 1092 (citation omitted).  However, when allegations concern a defendant's omissions, a plaintiff need not plead all of Rule 9(b)'s requirements because he "cannot plead either the specific time of [an] omission or the place, as he is not alleging an act, but a failure to act."  *Stickrath v. Globalstar, Inc*., 527 F. Supp. 2d 992, 998 (N.D. Cal. 2007) (quoting *Washington v. Baenziger*, 673 F. Supp. 1478, 1482 (N.D. Cal. 1987)).

### 1.    The Plaintiffs Have Plausibly Alleged Misrepresentations by Navy Federal

Navy Federal seeks dismissal of the UCL claim on the ground that Plaintiffs fail to identify a single alleged misrepresentation in any Account Agreements.  (ECF No. 9-1 at 20.)  The Court disagrees with Navy Federal's characterization of the FAC.  The core misrepresentation the FAC alleges is that Navy Federal represented that it "will only charge [overdraft fees] on transactions with insufficient funds to 'cover' a given transaction."  (FAC ¶¶38, 46, 135.)  Plaintiffs allege that this representation was false because Navy Federal charged overdraft fees on transactions that were authorized into positive funds.  (*Id*.)  These allegations sufficiently identify an allegedly false or misleading misrepresentation.  *See Hawthorne v. Umpqua Bank*, No. C-11-6700 YGR, 2012 WL 1458194, at *2 (N.D. Cal. April 26, 2012) (denying dismissal of UCL claims based on similar allegations that bank used misleading Account Agreements regarding overdraft fees); *see also Sutcliffe v. Wells Fargo Bank, N.A.*, 283 .F.R.D. 533, 548–49 (N.D. Cal. 2012) (finding UCL claim sufficient where plaintiffs identified the specific statements alleged to be fraudulent).

Navy Federal, however, argues that Plaintiffs cannot show that any representations in the Account Agreements were misleading because it properly disclosed whether and to what extent a member would have sufficient funds to cover transactions.  (ECF No. 9-1 at 20.)  Navy Federal contends that it disclosed that: "if

the amount of a [debit card] purchase transaction exceeds the available balance in your checking account or Checking Protection option on the date the transaction is paid, your account may be overdrawn." (*Id.* (citing Debit Card Disclosure at 1).) The Court construes Navy Federal's argument to be that members of the public were not likely to be deceived or misled and, therefore, Plaintiffs' UCL fraudulent claim fails as a matter of law.

Whether a business practice is deceptive is usually a question of fact not appropriate for decision on a motion to dismiss. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938–39 (9th Cir. 2008). In certain instances, a court may dismiss a UCL claim if no reasonable consumer would be likely to be deceived or misled by the alleged misrepresentations. *See Freeman v. Time, Inc.*, 68 F.3d 285, 290 (9th Cir. 1995) (finding that when a flyer was read as a whole, including the qualifying language, the plaintiff's allegation that a particular statement was deceptive was dispelled); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 990 (S.D. Cal. 2014) (dismissing UCL claims because no reasonable consumer would be misled by certain representations challenged by plaintiffs). But "[u]nless we can say as a matter of law that contrary to the complaint's allegations, members of the public were not likely to be deceived or misled by [the defendant's alleged conduct], we must hold that [plaintiffs] state[] a cause of action." *Day v. AT&T Corp.*, 74 Cal. Rptr. 2d 55, 60 (Cal. Ct. App. 1998) (declining to conclude on the facts alleged that no reasonable consumer would be likely to be misled or deceived by defendants' practices); *see also Morgan*, 99 Cal. Rptr. 3d at 786 (reversing dismissal of UCL claim in light of the conduct alleged). Dismissal on the reasonable consumer standard will generally be "the rare situation." *Williams*, 552 F.3d at 939.

Here, the Court cannot conclude as a matter of law, that *no* reasonable consumer would be likely to be misled or deceived by the defendants' representations in the Account Agreements. The FAC specifically alleges that a reasonable

consumer would believe that funds immediately debited for a transaction would be applied to the transaction for which they are debited, that overdraft fees would not be assessed a transaction authorized into sufficient funds, and that debit transactions reduce an available balance based on the order transactions are initiated. (FAC ¶¶64–71.) Considering the Account Agreements and the facts alleged, the Court is persuaded that a reasonable consumer could have interpreted Navy Federal's Account Agreements to mean that a debit card transaction that was authorized and approved by Navy Federal into positive funds, with corresponding funds held until the transaction posted, would not incur an overdraft fee when the transaction settled. Accordingly, the Court denies Navy Federal's motion to dismiss the UCL fraudulent claim on the ground that Plaintiffs have failed to allege any misrepresentations.

### 2. The Plaintiffs Have Failed to Adequately Plead Reliance

Navy Federal also challenges Plaintiffs' UCL claim on the ground that Plaintiffs fail to specifically allege that they actually read and relied on the alleged misrepresentations in Account Agreements. (ECF No. 9-1 at 21.) Although Plaintiffs acknowledge they must plead reliance, they contend there is a liberal reliance requirement under the UCL by which reliance may be presumed if a misrepresentation is material. (ECF No. 11 at 18.) Plaintiffs contend that the misrepresentations here were material and, therefore, the Court can infer reliance such that they have sufficiently pleaded their UCL fraudulent claim. (*Id.* at 19 (citing FAC ¶¶9, 12–21, 36–59, 64–71).) The Court agrees with Navy Federal that Plaintiffs' UCL fraudulent claim is subject to dismissal for failure to sufficiently plead reliance.

The issue regarding what a plaintiff must plead to show reliance sufficient to state a UCL claim arises from the California Supreme Court's decision in *In re Tobacco II Cases*, 207 P.3d 20, 28 (Cal. 2009), a case on which Plaintiffs heavily rely to oppose dismissal. In that case, a group of plaintiffs sought to represent a class of all people in California who smoked one or more cigarettes during the class period

and were exposed to the defendants' long-term marketing and advertising activities in California. The California Supreme Court held that the UCL "imposes an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong." *Id.* at 39. But it appeared to relax that requirement. The court stated that "a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Id.* at 39. The court further stated a plaintiff does not "need to demonstrate individualized reliance on specific misrepresentations to satisfy the reliance requirement," and "is not required to allege that that those misrepresentations were the sole or even the decisive cause of the injury-producing conduct." *Id.* at 40. Plaintiffs' position regarding these latter statements by the California Supreme Court is not without some support. Relying on *In re Tobacco II Cases*, one federal district court in the Ninth Circuit determined that similar allegations regarding overdraft misrepresentations "give rise to at least an inference that Plaintiffs relied on the representations. . ." *See Hawthorne*, 2012 WL 1458194, at *2. This Court, however, is not persuaded that Plaintiffs are relieved from expressly pleading actual reliance.

    *In re Tobacco II Cases* establishes that there is "an actual reliance requirement [for] plaintiffs prosecuting a private enforcement action under the UCL's fraud prong" even if the nature of that requirement is relaxed under certain circumstances. *In re Tobacco II Cases*, 207 P.3d at 39. Distinguishing the facts of that case, multiple courts in the Ninth Circuit have required a plaintiff to plead actual reliance on a misrepresentation. *See, e.g., In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *16 (N.D. Cal. Aug. 30, 2017) ("California courts have held that when the 'unfair competition' underlying a plaintiff's UCL claim consists of a defendant's misrepresentation or omission,' a plaintiff must plead that he or she 'actually relied on the misrepresentation or omission' to bring a UCL claim."); *Letizia v. Facebook, Inc.*, 267 F. Supp. 3d 1235, 1243 (N.D. Cal. 2017) ("[I]n order for a UCL claim to survive a motion to dismiss,

a plaintiff must sufficiently satisfy the actual-reliance requirement, which means the plaintiff must allege that he or she saw the specific misrepresentation at issue and actually relied on it."); *McVicar v. Goodman Glob., Inc*., 1 F. Supp. 3d 1044, 1052 (C.D. Cal. 2014) (dismissing UCL claim because the plaintiffs "make absolutely no allegation that either they or their contractor checked defendant's website or saw any advertisement by defendant); *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1047 (N.D. Cal. 2014) ("[T]he Court has consistently required allegations of actual reliance and injury at the pleading stage for claims under all three prongs of the UCL where such claims are premised on misrepresentations"). Thus, even if a plaintiff need not plead reliance extensively to have UCL standing in light of *In re Tobacco II Cases*, there must still be actual allegations of reliance. This "specific pleading is necessary to establish a causal relationship between alleged misrepresentations and the harm claimed to have resulted therefrom." *Monaco v. Bear Stearns Companies, Inc*., No. CV 09–05438 SJO (JCx), 2011 WL 11027559, at *8 (C.D. Cal. Jan. 13, 2011) (quoting *Mirkin v. Wasserman*, 858 P.2d 568, 573 (Cal. 1993)).

Here, the FAC contains no allegations that Plaintiffs actually relied on Navy Federal's misrepresentations, such as allegations that Plaintiffs read the alleged misrepresentations or that they would not have opted into Navy Federal's OOPS but for Navy Federal's misrepresentations. Plaintiffs' UCL claim is therefore subject to dismissal. *See, e.g., Letizia*, 267 F. Supp. 3d at 1243–44 (dismissing UCL claim where "Plaintiffs never state in their complaint that they ever saw" the alleged misrepresentations); *Murray v. Elations Co*., No. 13-cv-2357-BAS(WVG), 2014 WL 3849911, at *10 (S.D. Cal. Aug. 4, 2014) (dismissing UCL claims in part because plaintiff did not allege that he was exposed to and relied on defendants' alleged misrepresentations).

Second, and independent of whether Plaintiffs have adequately pleaded reliance under the UCL, are Rule 9(b)'s pleading requirements for fraud claims in federal court. Although Navy Federal does not flesh out its Rule 9(b) challenge to

the UCL claim in the context of Plaintiffs' failure to plead that they actually read and relied on the alleged misrepresentations, Rule 9(b) independently warrants dismissal on this issue. Several courts have determined that *In re Tobacco II Cases* cannot relax Rule 9(b)'s requirement that a plaintiff plead with particularity the circumstances pertaining to alleged fraud. *See, e.g.*, *Garcia v. Sony Computer Entm't Am., LLC*, 859 F. Supp. 2d 1056, 1063 (N.D. Cal. 2012); *Herrington v. Johnson & Johnson Consumer Cos.*, No. C 09-1597 CW, 2010 WL 3448531, at *8 (N.D. Cal. Sept. 1, 2010); *In re Actimmune Mktg. Litig.*, No. C 08-02376 MHP, 2009 WL 3740648, at *8 (N.D. Cal. Nov. 6, 2009). Although Rule 9(b)'s requirements are less stringent with claims of omissions by a defendant, claims pertaining to affirmative misrepresentations are not. Despite Plaintiffs' suggestion in opposition that their UCL claims also concern omissions by Navy Federal (ECF No. 11 at 18, 20), their claims are premised on affirmative misrepresentations. (FAC ¶ 135.) Thus, Plaintiffs must provide particularized allegations regarding the circumstances of Navy Federal's alleged misrepresentations. *See Letizia*, 267 F. Supp. 3d at 1244 ("Plaintiffs must state 'the who, what, when, where, and how' of the misconduct charged. . ." (quoting *Vess*, 317 F.3d at 1106)).

Although the FAC sufficiently identifies what Plaintiffs contend were Navy Federal's alleged misrepresentations, as the Court has already determined, the FAC is otherwise deficient regarding Plaintiffs' exposure to those alleged misrepresentations, including when Plaintiff read the alleged misrepresentations in the Opt-In Form. *See id.* at 1244–45 (stating that "the law of actual reliance . . . dooms Plaintiffs' UCL claim under Rule 9(b)'s heightened pleading requirement . . .") (citing *In re 5-Hour Energy Mktg. & Sales Practices Litig.*, No. MDL 13-2438 PSG (PLAx), 2014 WL 5311272, at *16 (N.D. Cal. Sept. 4, 2014)). Accordingly, the Court grants Navy Federal's motion to dismiss Plaintiffs' UCL claim on the ground that Plaintiffs have failed to adequately plead reliance on Navy Federal's alleged misrepresentations. As Plaintiffs have requested and Navy Federal does not

oppose, the Court will grant Plaintiffs leave to amend the FAC to provide additional allegations to show reliance and satisfy Rule 9(b)'s pleading strictures for the named Plaintiffs.

### G.     California CLRA Claim

The FAC pleads a claim under the California Consumer Legal Remedies Act ("CLRA"), CAL. CIV. CODE §§1770, *et seq.*, on behalf of a sub-class of California plaintiffs.  (FAC ¶¶138–144.)   The CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts or practices in a transaction intended to result or that results in the sale or lease of goods or services to any consumer."  CAL. CIV. CODE §1770(a).  Plaintiffs allege that they are consumers within the meaning of the CLRA and allege that "[Navy Federal's] checking accounts and debit card services were transactions" covered under the CLRA.  (FAC ¶¶139–40.)  Navy Federal allegedly violated the CLRA "by misleading consumers to believe that [overdraft fees] will not be charged when sufficient funds exist to 'cover' transactions, when [overdraft fees] are in fact charged in such circumstances."  (*Id.* ¶142 (citing CAL. CIV. CODE §1770(a)(5).)  Plaintiffs allege that this conduct violates the CLRA's prohibition on "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." CAL. CIV. CODE §1770(a)(5).  Navy Federal argues that, as a threshold matter, the CLRA is inapplicable to claims concerning debit cards and overdraft and, therefore, Plaintiffs' CLRA claims must be dismissed.  The Court agrees with Navy Federal.

The scope of the CLRA turns on its express terms, including how it defines those terms.  A plaintiff pleading a CLRA claim must plead sufficient facts to show that his or her claim satisfies these statutory definitions, as applicable, in addition to identifying the prohibited practice in which the defendant allegedly engaged.  Plaintiffs implicitly recognize this by pleading that their CLRA claims satisfy certain terms defined by the CLRA, such as the terms "consumer" and "transaction."  (FAC

¶¶139–40.)  The CLRA defines "consumer" as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purpose."  CAL. CIV. CODE §§1761(d).  A transaction is defined as "agreement between a consumer and another person . . ."  CAL. CIV. CODE §§1761(e).  Although the FAC does not expressly state that Navy Federal's debit card services satisfy the CLRA's definition of "services," it is the only type of service to which the CLRA claim refers.  The CLRA defines "services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods."  CAL. CIV. CODE §1761(b).  Navy Federal's challenge turns on this provision.

The California Supreme Court has not spoken on the issue of whether the CLRA applies to debit card transactions or overdrafts.  "If the state [S]upreme [C]ourt has not spoken on the issue, we look to intermediate appellate courts for guidance, although we are not bound by them if we believe that the state [S]upreme [C]ourt would decide otherwise."  *Radcliffe v. Hernandez*, 818 F.3d 537, 543 (9th Cir. 2016) (citing *In re KF Diaries, Inc. & Affiliates*, 224 F.3d 922, 924 (9th Cir. 2000)).  Navy Federal points this Court to guidance from the California Court of Appeal decision in *Berry v. American Express Publishing, Inc*., 54 Cal. Rptr. 3d 91 (Cal. Ct. App. 2007).

Because *Berry* is fundamental to resolution of Navy Federal's challenge, a relatively closer review of this decision is warranted.  The *Berry* court held that credit transactions, separate and apart from any sale or lease of goods or services, are not covered under the CLRA.  *Id.* at 97.  The court arrived at this conclusion by reviewing the legislative history of the CLRA's definition of the term "consumer."  The court observed that an earlier draft of the CLRA defined "consumer" as "an individual who seeks or acquires, by purchase or lease, any goods, services, *money, or credit* for personal, family or household purposes."  *Id.* at 95 (citing Cal. Assem. Bill No. 292 (1970 Reg. Sess.)) (emphasis in original).  Prior to the CLRA's enactment, however,

the California Legislature removed references to "money" and "credit," with the current version of the CLRA omitting any reference to such terms. *Id.*; *see generally* CAL. CIV. CODE §§1770, *et seq*. Earlier drafts of the CLRA identified the extension of credit as a separate activity from purchasing or leasing goods or service, with the final version of the CLRA deleting prior specific references to coverage for any consumer who obtains credit. 54 Cal. Rptr. 3d at 96. This confirmed to the *Berry* court that the deletion of the terms "money" and "credit" "narrowed the act's scope." *Id*. More generally, the *Berry* recognized that the California Legislature narrowed the scope of the CLRA from covering unlawful acts or practices "undertaken by any person in the conduct of any trade or commerce" to only those practices "undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer . . . " *Id.* (citing CAL. CIV. CODE §§1770(a)). Thus, under the court's view, CLRA liability is limited to transactions involving the actual or contemplated sale or lease of goods and services. *Id*. The court rejected the plaintiff's argument that the CLRA's instruction to apply its provisions liberally could be used to "rewrite the statute . . . beyond its express terms." *Id.* at 96–97.

Federal district courts in the Ninth Circuit have applied *Berry* to dismiss CLRA claims concerning credit cards provided by a defendant, including cases involving fees associated with credit cards. *See Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1359 (N.D. Cal. 2007) (dismissing with prejudice CLRA claims concerning credit cards, including defendant's alleged misleading disclosures regarding fees); *Augustine v. FIA Card Servs., N.A.*, 485 F. Supp. 2d 1172, 1175 (E.D. Cal. 2007) ("California law provides that the CLRA does not apply to credit card transactions") (dismissing CLRA claims regarding defendant's alleged retroactive increase of interest rates on credit cards).

Although *Berry* did not concern debit cards or overdrafts, its reasoning has been applied by federal courts to these issues. In *Gutierrez v. Wells Fargo & Company*, the court granted summary judgment against the plaintiffs' CLRA claim

on the ground that the plaintiffs had failed to identify the purported good or service received *from the bank*. 622 F. Supp. 2d 946, 957 (N.D. Cal. 2009) ("[P]laintiffs likely bought goods and services in many instances with the money extended because of overdrafts. But not from the bank."). Analogizing the extension of money through an overdraft to the extension of credit via a credit card, the court determined that the bank's activities with respect to overdrafts and overdraft fees did not fall within the meaning "goods" or "services" under the CLRA. *Id.* (citing *Berry*, 54 Cal. Rptr. 3d 91). *Berry* and *Gutierrez* were applied by another federal court overseeing a multidistrict overdraft litigation concerning debit cards, check cards or ATM cards provided by defendant banks to the plaintiffs. *See In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1326–27 (S.D. Fla. 2010). The court rejected the notion that a bank's decision to extend funds to cover a client's overdraft is a service and dismissed the plaintiffs' CLRA claims. *See id*. These authorities point toward dismissal here.

Nevertheless, Plaintiffs contend that Navy Federal's reliance on *Berry* and *Gutierrez* is erroneous. (ECF No. 11 at 21.) Plaintiffs argue that debit card services are a covered "service" under the CLRA by relying on the single federal court decision holding so: *Hawthorne v. Umpqua Bank*, No. 11-cv-06700-JST, 2013 WL 5781608 (N.D. Cal. Oct. 25, 2013). (ECF No. 11 at 21.) While acknowledging *Berry*, *Gutierrez* and *In re Checking Account Overdraft Litigation*, the *Hawthorne* court determined that debit cards are a "service" for the purposes of the CLRA on reasoning this Court finds unpersuasive. First, the court pointed to the CLRA's instruction that its provisions must be "liberally construed." *Hawthorne*, 2013 WL 5781608, at *10 (quoting Cal. Civ. Code §1760). The instruction to liberally interpret the CLRA, however, does not resolve the question of the statute's scope. The *Berry* court expressly rejected the notion that this provision grants a court license to expand the CLRA beyond its text, appropriately informed by its legislative history. *Berry*, 54 Cal. Rptr. 3d at 96. This Court similarly finds *Hawthorne*'s reliance on this

provision unhelpful.

Second, the *Hawthorne* court also determined "the debit card relationship is best understood as encompassing convenience services that go beyond those associated with a simple checking account." *Hawthorne*, 2013 WL 5781608, at *10. To reach this conclusion, the *Hawthorne* court relied on *Hitz v. First Interstate Bank*, 44 Cal. Rptr. 2d 890 (Cal. Ct. App. 1995), which determined that the convenience feature of credit cards was a service, independent of borrowing. *Hawthorne*, 2013 WL 5781608, at *11. As is evident from the very text of the *Hitz* decision on which the *Hawthorne* court relied, however, *Hitz* interpreted the term "service" under a *different* California statute, California Civil Code §1671(c). *Id.* (quoting *Hitz*, 44 Cal. Rptr. 2d at 898–99). As another California Court of Appeal decision observed, "*Hitz* did not involve the CLRA . . . . That court's interpretation of Civil Code section 1671. . . does not inform the interpretation of provisions of separate sections in the Civil Code containing the CLRA." *Ball v. FleetBoston Fin. Corp*., 79 Cal. Rptr. 3d 402, 405 (Cal. Ct. App. 2008) (affirming dismissal of CLRA claim premised credit card despite plaintiff's allegation that defendant bank provided payment services because "the act of extending credit alone is not covered by the CLRA" ). Regardless of whether debit cards may be a service for the purposes of a different statute, the question is whether they are a covered service under the CLRA. Plaintiffs identify no authority showing this to be the case.

This Court is persuaded that Plaintiffs cannot pursue CLRA claims here. The CLRA does not apply to claims involving debit cards or overdrafts associated with those cards, separate and apart from any transaction involving, or intended to result in, a sale or lease of goods or services. *See In re Checking Account Overdraft Litig*., 694 F. Supp. 2d at 1326–27; *Gutierrez*, 622 F. Supp. 2d at 957; *cf. Van Slyke*, 503 F. Supp. 2d at 1359. Plaintiffs identify no goods or services covered under the CLRA, which they received from Navy Federal. As another federal district court has recognized, "[m]uch like credit cards provide an extension of credit, an overdraft

– 43 –

provides an extension of money." *Gutierrez*, 622 F. Supp. 2d at 957. Beyond this recognition is the *Berry* court's review of the CLRA's legislative history, which shows that a reference to "money" was removed from an earlier CLRA draft—much like the reference to "credit." *Berry*, 54 Cal. Rptr. 3d at 95. This legislative history convinces this Court that the overdraft protection at issue here does not constitute a "service" under the CLRA. Accordingly, the Court grants Navy Federal's motion to dismiss Plaintiffs' CLRA claims with prejudice.

## IV. CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Navy Federal's motion to dismiss the First Amended Complaint (ECF No. 9) as follows:

1. The Court **DENIES** the motion to dismiss Plaintiffs' breach of contract claim (claim 1) and conversion claim (claim 3).

2. The Court **GRANTS WITH PREJUDICE** the motion to dismiss Plaintiffs' unjust enrichment claim (claim 4) and CLRA claim (claim 6).

3. The Court **GRANTS WITHOUT PREJUDICE** the motion to dismiss Plaintiffs' breach of the implied covenant of good faith and fair dealing claim (claim 2) and UCL claim (claim 5).

4. Plaintiffs are **GRANTED LEAVE TO AMEND** the FAC consistent with this Order. Plaintiffs may file a Second Amended Complaint **no later than May 4, 2018**. Failure to file a SAC by this date will result in the case proceeding only as to the claims not dismissed by this Order.

**IT IS SO ORDERED.**

**DATED: April 12, 2018**

Hon. Cynthia Bashant
United States District Judge